ESTATE OF D. D. PALMER, DECEASED, RICHARD L. BRAUN-STEIN AND DAVENPORT BANK & TRUST CO., EXECUTORS, AND A. H. PALMER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3775–78.    Filed January 22, 1986.

*Albert H. Turkus* and *Bernard J. Long, Jr.*, for the petitioners.
*Thomas C. Morrison*, for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal individual income tax against petitioners as follows:

| Year | Deficiency |
| --- | --- |
| 1971 | $41,865.79 |
| 1972 | 76,171.10 |
| 1973 | 25,992.78 |

Petitioners claim an overpayment for 1973 in the amount of $30,000, or such greater amount as they may be entitled to.[1] The issue for decision is the fair market value, as of August 25, 1971, of certain improved real property that was contributed to an eligible charitable donee.

### FINDINGS OF FACT

Some of the facts have been stipulated, the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners D.D. Palmer and A.H. Palmer, husband and wife,

---

[1] See note 6 *infra.*

resided in Davenport, Iowa. D.D. Palmer died in May, 1978; thereafter, his estate was substituted as a petitioner.

On August 25, 1971, D.D. Palmer donated certain land and improvements located at 808 Brady Street, Davenport, Iowa, (hereinafter sometimes referred to as the property) to the Palmer College Foundation (hereinafter sometimes referred to as the foundation), an organization described in sections 170(c)(2)[2] and 509(a)(1). At all times material to the instant case, the foundation's principal activity was the ownership and operation of the Palmer College of Chiropractic (hereinafter sometimes referred to as the college). The college is an organization engaged primarily in the education and training of Doctors of Chiropractic. It is the world's first, and one of the largest, chiropractic colleges.

The property consists of a half-acre (180' by 125') rectangular lot (hereinafter sometimes referred to as the land), improved by a three-story building (hereinafter sometimes referred to as the mansion), a two-story garage (which was subsequently removed), and "A Little Bit O'Heaven" (a museum consisting of a conservatory, or greenhouse, and a courtyard used for the display of objets d'art and flora and fauna).[3] The property is located on the same city block as the college and is immediately adjacent to the principal classroom building and most of the other buildings used by the college.

The mansion was built sometime around 1875 to 1885. The basic structure of the mansion is that of an opulent Victorian residence, parts of which are rich with handcarved oak and walnut, beveled and leaded glass, parquet floors, and ornamental plaster walls and ceiling. Between 1912 and 1922 a horseshoe-shaped addition was built, more than doubling the size of the ground floor level. By 1922, "A Little Bit O'Heaven" had also been built. Although "A Little Bit O'Heaven" was opened to the public in 1924, it was never a commercially viable enterprise. The conservatory is expensive to maintain; it is subject to vandalism; it is not large enough for a nursery or greenhouse operation to be profitable; it lacks economic or commercial utility for any

---

[2]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.

[3]The property donated by petitioners does not consist of any tangible personal property such as household furnishings and objets d'art.

other purpose. At the time of the trial, the college's board was considering removal of the conservatory. The mansion has never received any type of governmental or quasi-governmental historical or architectural recognition. The college has never sought such recognition.

D.D. Palmer's grandfather, Daniel David Palmer, was the discoverer of the principles of chiropractic and founder of what is now the nonmedical profession of chiropractic. In 1895, Daniel David Palmer started a School of Chiropractic in rented quarters in the Ryan Building in Davenport, at the corner of Brady and Third Streets, the same building in which he had discovered chiropractic. The Ryan Building was torn down in 1980; the college made arrangements to buy several loads of the resulting bricks.

The property was first acquired by the Palmer family when D.D. Palmer's father, B.J. Palmer, bought the land and the mansion in 1912, and was in the continual possession of that family until 1971, when it was donated to the foundation. The mansion was primarily the Palmer family residence. After the death in 1949 of Mabel Palmer (D.D. Palmer's mother), B.J. Palmer lived in the mansion with attendants, caretakers, and so on, until B.J. Palmer died, in 1961.

In 1913, B.J. Palmer founded the college and served as its president until his death in 1961.[4] Stables adjoining the mansion were converted into the college's first classroom. Early in the history of the college, the mansion served as a dormitory for a number of the students. Monthly faculty meetings were held in the mansion, and chiropractic leaders met around the dining room table to discuss matters of significance to the profession. The growth of chiropractic has been described as one of the most remarkable social phenomena in America. There are more than 20,000 chiropractors in the United States alone, with additional numbers in foreign countries. The perpetuation and development of chiropractic in the face of strenuous opposition from the established medical profession was due almost entirely to

---

[4]So stipulated. Some of our findings as to the college's history conflicts with testimony of the witnesses and the exhibits in the instant case, and with the accounts set forth in *Palmer v. Commissioner*, 62 T.C. 684 (1974), affd. 523 F.2d 1308 (8th Cir. 1975). These conflicts, which are not significant to our conclusions in the instant case, have been resolved by relying primarily on the parties' stipulations in the instant case.

the efforts of B.J. Palmer. B.J. Palmer was flamboyant, energetic, enigmatic, and controversial. A charismatic leader, he was the preeminent figure in, and spokesman for, the chiropractic profession. On the death of B.J. Palmer in 1961, D.D. Palmer became president of the college and served as such until his death in May 1978. The mansion has not been used as a residence since B.J. Palmer's death in 1961.

From 1961 onward, the first floor of the mansion was used by the college for ceremonial and alumni functions and for the display of art objects and chiropractic memorabilia. During this period, the second and third floors have generally been closed and have been used for storage purposes. "Pioneer" luncheons for 50-year graduates have been held annually at the mansion. Quarterly graduating classes are given their alumni certificates at receptions held in the mansion; the flowers for many of these graduation ceremonies are grown in the mansion's conservatory.

The property is located in an area that is zoned "C-2" commercial, which is a retail zoning that could include, but not be limited to, the following types of businesses: photography shops, filling stations, restaurants, and parking lots. Actually located in this area, in addition to the Palmer College of Chiropractic, is the Palmer Junior College, Central High School, the Sawyer Business College, radio station WOC, the Episcopal Cathedral, and numerous multiple-family dwellings and commercial establishments. The property is about six blocks from the heart of Davenport's downtown business district; it is in a neighborhood that is primarily commercial in character. The property is on a street that is heavily traveled and is in a congested part of the city. Historically, and in 1971 (the year of the donation of the property to the foundation), there has been a critical need for convenient parking in the immediate vicinity of the property. Since 1963, the college has spent nearly $2 million to buy land, most of it for use as parking.

The membership of the International Chiropractors Association includes graduates of the college as well as graduates of other chiropractic institutions. The college, the College's Alumni Association, and the International Chiro-

practors Association have harmonious relationships with each other. At the time of the trial in the instant case, Joseph P. Mazzarelli (hereinafter sometimes referred to as Mazzarelli), an alumnus of the college, was chairman of the board of the college and also was chairman of the board of the International Chiropractors Association. Previously, he had been president of the International Chiropractors Association.

Table 1 shows the positions of (1) the parties, (2) their expert witnesses, and (3) the Court, as to the fair market value of the property on August 25, 1971.

TABLE 1

| | | |
|---|---|---:|
| (1) | Petitioners—income tax returns | [5]$315,975 |
| (2) | Petitioners—petition | 420,000 |
| (3) | Petitioners—brief | [6]520,500 |
| (4) | Petitioners—expert witness (Fisher) | 320,000 |
| (5) | Petitioners—expert witness (Stewart) | [7]426,897 |
| (6) | Respondent—notice of deficiency | 79,000 |
| (7) | Respondent—expert witness (Willits) | 79,000 |
| (8) | Court—ultimate finding of fact | 80,000 |

OPINION

Petitioners are authorized to take deductions under section 170(a)(1)[8] for the fair market value of property they contribute to eligible charitable donees. Sec. 1.170–1(c)(1),

---

[5]Because of the 50-percent annual ceiling on charitable contribution deductions (sec. 170(b)(1)(A)) and the carryover rules (sec. 170(d)), petitioners deducted $144,182.78 for 1971, $124,795.46 for 1972, and $41,620.46 for 1973. The sum of these deductions is $310,598.70. The record does not include a reconciliation of this sum and the $315,975 total fair market value stated on petitioners' tax returns for each of these 3 years.

[6]Petitioners' claim for overpayment of $30,000 appears in their petition, and presumably results from their contention that the property had a fair market value of $420,000. It is not clear whether, as a result of petitioners' contention on brief that the property had a fair market value of $520,500, petitioners now claim a greater overpayment for 1973 or a carryover of charitable contribution deductions to 1974 or later years.

[7]This figure does not include an estimate of the value of the land. The figure represents the estimated cost to reproduce the improvements.

[8]SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

    (a) ALLOWANCE OF DEDUCTION.—

        (1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

        [The subsequent amendment of this provision by sec. 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1834, does not affect the instant case.]

Income Tax Regs.[9] The parties agree that the foundation is an eligible charitable donee. Respondent does not contest petitioners' contention that the applicable percentage limitation in this instance, as defined by section 170(b)(1), should be 50 percent. Similarly, the parties agree that the provisions of section 170(e) do not apply to reduce petitioner's deductions below fair market value.

Generally, the fair market value of property is the price at which a willing buyer will purchase the property from a willing seller, when neither is acting under compulsion and both are fully informed of the relevant facts and circumstances. E.g., *Palmer v. Commissioner*, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684, 696 (1974); *McShain v. Commissioner*, 71 T.C. 998, 1004 (1979). Respondent's determination in the notice of deficiency as to the fair market value of the subject property is presumptively correct, and petitioners bear the burden of proving that the fair market value is higher. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.

At trial, both sides presented the testimony of expert witnesses to establish the fair market value of the donated property. It would serve no useful purpose to make a detailed analysis of the testimony of these experts to explain item by item the extent to which we agree or disagree with their analysis. Valuation is not a precise science, and the determination of the fair market value of property on a given date is a question of fact (*Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965)), to be resolved on the basis of the entire record (*McShain v. Commissioner*, 71 T.C. at 1004), and without necessarily being bound by the opinions of the expert witnesses (*Palmer v. Commissioner*, 523 F.2d at 1310). However, we will note some of the considerations that we have taken into account in our determination.

Respondent's expert witness, J.T. Willits (hereinafter sometimes referred to as Willits), holds a real estate brokers license and has made numerous court appearances as an expert appraiser. Willits states that "the highest and best

---

[9]Under the current regulations, the corresponding rules appear at sec. 1.170A–1(c), Income Tax Regs.

use of this lot, if unimproved, would be for use as additional parking for the Palmer College or as the site of a fast-food restaurant or quick service food store." Using a market data approach,[10] Willits values the land at $79,000. However, valuing the entire property as though its highest and best use would be as a single family residence and, again, using a market data approach, Willits states that the property's total value (land and improvements) would range from $34,000 to $38,500. Willits concludes that "The subject property used as developed for a single family residence does not have a value commensurate with the value of the lot for commercial usage." Accordingly, Willits concludes that the improvements to the land have no value.[11]

Petitioners agree that the value of the land alone is $79,000, using a market data approach and valuing the land as though it were vacant and available for commercial development. Further, both sides agree that the capitalization of income method[12] of valuing property is not appropriate in this instance to value the improvements.

Petitioners presented at trial the testimony of two expert witnesses, Edmund C. Fisher and Harold J. Stewart (hereinafter sometimes referred to as Fisher and Stewart, respectively). Fisher holds a real estate brokers license and has been qualified as an expert real estate valuation witness in numerous courts, including this Court. Stewart is an architect.

In valuing the improvements (i.e., the mansion, the conservatory, "A Little Bit O'Heaven"), Fisher determined that the highest and best use of the improvements is "as a focal point for, as a rallying point for chiropractic * * * as a shrine". Fisher determined the value of the donated

[10]The market data approach is based on the commonsense approach of taking the actual sales price of the properties similar to the subject property and then relating these prices to the subject property. This Court has often used this valuation method. See *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 18–21 (1979).

[11]Willits' appraisal report does not address the demolition cost or salvage value of the improvements. Willits testified at trial, however, that these two figures tend to offset one another.

[12]The capitalization of income approach to value represents a method of determining the fair market value of property by analyzing the present worth of income which the property will produce or may be expected to produce in the future. This income projection is translated into a present fair market value indication for property through a process known as capitalization. The capitalization of income approach is practical only when an income stream attributable to the real estate can be estimated.

improvements to be $243,194.65. The total value of the donated property is, therefore, according to Fisher, $321,194.65,[13] rounded to $320,000. Stewart, on the other hand, testified at trial that he was not competent to render an opinion of the highest and best use of the property. However, based on a reproduction cost method of valuation, Stewart determined that the value of the improvements is $426,897.

But for the shrine aspect of the property, it appears that there was a market for such properties and that the fair market value would be $79,000. The willing purchaser in such a market would be one who would remove the mansion and the other improvements. According to Willits, a willing purchaser who intended to use the property as it was, i.e., the mansion used for residential purposes (the basic use to which the mansion had been put until B.J. Palmer's death, in 1961), would not pay even as much as half the price that a developer would pay. It appears that, in effect, a willing purchaser attracted by the shrine aspect of the property would be paying a premium of more than $40,000 for this shrine aspect alone, in order to match the developer's price.

Petitioners contend that the basic dispute between the parties is as to what is the "highest and best use" of the property, and that resolution of this dispute is "a fundamental, preliminary step in ascertaining value." Petitioners contend that the highest and best use of the property is "as a focal point for, and symbol of, the College; as a showplace, historical monument, shrine and museum memorializing B.J. Palmer and commemorating the Palmer family's preeminent role in Chiropractic; as a tangible embodiment of the history and tradition of Chiropractic; and as an integral and active part of the College." Petitioners point out that there were no sales of properties that were comparable to the property in terms of the historical significance of the improvements. They point out that the property did not produce income. They conclude that the property must be valued by reference to the fair market value of the land plus the cost of reproducing the improvements, with adjustments for depreciation, etc. Peti-

[13]Fisher originally valued the land at $78,000.

tioners' expert witnesses focus primarily on this reproduction cost.

We do not agree that we are bound to follow that sequence in analyzing the situation. We note that the text to which petitioners refer us describes "highest and best use" as follows (American Institute of Real Estate Appraisers, The Appraisal of Real Estate 43, 45 (1978)):

HIGHEST AND BEST USE

Fundamental to the concept of value is the theory of highest, best, and most profitable use. Land is valued as if vacant and available for its highest and best use. Highest and best use for land is *the use that, at the time of appraisal, is the most profitable likely use.* It is the use that will provide the greatest return to the land after the requirements of labor, capital, and coordination have been satisfied. Thus it may also be defined as *the available use and program of future utilization that produces the highest present land value.*

  \*   \*   \*   \*   \*   \*   \*

When existing improvements do not constitute the highest and best use of a site, the highest and best use for the property, as improved, constitutes a separate consideration. Present highest and best use for the property may be affected by a substantial existing improvement or by a long-term lease involving the property as presently developed. The basic concept—highest and best use is the available use or program of future utilization that produces the highest present value as applied to land—is similarly applicable in the analysis of improved properties. The appraiser considers alternate use possibilities leading to selection of the program of use that best meets the objective of the concept.

[Emphasis in original.]

Evidently, it may well be necessary to determine fair market values based on several different uses in order to determine highest and best use. Since our task is to determine the fair market value of the property, it is not clear why we must initially determine highest and best use before we consider fair market value. Indeed, it does not appear that we can determine highest and best use in the instant case without first considering fair market values based on alternative uses.

Further, we do not agree that we must ignore the market data approach. Our task, after all, is to determine fair *market* value. If there is a relevant, although distinguishable market, we then may consider that market and make appropriate adjustments.

Also, we must take into account the concept (with which both sides agree) that a purchaser would not offer an amount greatly in excess of the last offer by a competitor. This point was clearly made in the following testimony on cross examination, given by Mazzarelli, chairman of the board of the College:

Q. [Respondent's counsel.] Well, Dr. Mazzarelli, perhaps I can just sharpen the question a little bit further. Let's assume that the college had in its treasury at that time a million dollars. And on the—at this public auction that we are postulating here, the college could acquire the property for $100,000.

Now as an alumni [sic], as chairman of the board, would you have, you know, recommended that any greater amount be bid if the property could have been acquired for $100,000?

\* \* \* \* \* \* \*

THE WITNESS: Well, it would be, I think, irresponsible as chairman of the board that I would pay more than asked for anything.

If they are asking $100,000 why offer a million? The value of this property to the alumni and the alumni association isn't how much it costs in dollars, but what it means in aesthetics and history and emotionally, subjectively as well as the fact that it has a history that is totally objective to our single purpose institution.

Finally, we reject petitioners' reproduction cost analysis because it would lead to the absurd result that the fair market value of the property as a shrine would be independent of the breadth and depth of interest in acquiring or preserving the shrine. Thus, under petitioners' analysis, if Abraham Lincoln's boyhood log cabin home could be located, then its fair market value would be trivial because the cost of reproducing a log cabin would be trivial. Similarly, Mt. Vernon would have the same fair market value if it had been B.J. Palmer's home, as it has because it was George Washington's home, because the reproduction cost is not affected by whether it was the home of the one rather than the home of the other.

We are left with the following:

(1) The property is in a commerically zoned area of Davenport, Iowa.

(2) The property had been used primarily for residential purposes for substantially the entire life of the mansion, the major improvement on the property.

(3) Apart from its status as a shrine, the property probably would fetch $79,000 in the open market, with the purchaser at that price removing the improvements (including the mansion) in order to use the property for commercial purposes.

(4) The foundation (or the college), with the expected assistance of its alumni, probably would be willing to pay more than $79,000, if that were necessary in order to be able to use the property as a shrine.

(5) The foundation (or the college) would not face any competition above the $79,000 level. The foundation (or the college) would not pay $315,975 (petitioners' tax returns) or $420,000 (petition) or $520,500 (petitioners' opening brief) for the property if the last competitive bid were only $79,000.

Under these circumstances, we do not believe that reproduction cost is helpful in determining the fair market value of the property. See *Carty v. Commissioner*, 38 T.C. 46, 66 (1962); cases collected at 10 J. Mertens, Law of Federal Income Taxation, sec. 59.06 (1984 rev.).

From the foregoing, taking into account the foundation's evident intention to outbid developers, we conclude (and we have found) that the fair market value of the property is $80,000. See *Buffalo Tool & Tool Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980).

On brief, petitioners seek to demonstrate that Willits—respondent's expert witness—has provided a foundation for petitioners' requested finding of a substantially greater fair market value, as follows:

[Willits] admitted that there would certainly be people, other than the College, who "would like to purchase the property because of its historical significance." [Tr. 436] In fact, he indicated that he was "positive" that such people could exist. [Tr. 437] Moreover, he testified that all of these interested parties would bid against each other in an attempt to purchase the Property, and that in so doing they would pay more for the Property than someone who was interested in purchasing the Property for its land value. [Tr. 438–40] In this hypothetical auction, at least one bidder, the College, would have made "whatever sacrifices it had to" and would have bettered any offer in order to obtain the Property.[5] [Tr. 64, 150–51]

---

[5] This is corroborated by the fact that the College is planning to spend $500,000 to enhance the Chiropractic museum, in addition to annual maintenance. [Tr. 113]

Notwithstanding a considerable interest in the Property, no one could reasonably be expected to pay more than what would be necessary to obtain it. However, the government's witness has candidly admitted that the Petitioner, as owner of the Property, "probably would not have" sold it for less than an amount determined under the cost approach because to have done otherwise would not have been prudent. [Tr. 470] Thus, we have the classic situation of several willing buyers, one of which would pay whatever price was necessary to purchase the property, and a seller who would only be willing to sell for an amount not less than the property's structural worth. Because the property would be irreplaceable to all concerned, it is submitted that in these circumstances, the bidding could easily have *exceeded* depreciated reproduction cost. Clearly, the selling price would not have been less than this amount.

## Elsewhere on brief, petitioners assert the following:

Mr. Willitts [sic] also admitted that there would be several potential buyers, including the College, who would be interested in purchasing the property due to its historical (or sentimental) significance. He further testified that these persons would bid against each other to acquire the property, conceding that they would pay more than the land value to do so. [Tr. 442, 458–59] Finally, he admitted that the Petitioner would not have sold the Property for $79,000, the value of the land, but would have demanded considerably more than that amount. [Tr. 470]

Firstly, Willits had no basis for knowledge about people or organizations who might bid *against* the foundation (or the college) because of any such people's or organizations' desire to use the property as a shrine and to stop the foundation or the college from so using the property.

Secondly, Willits did not testify that "all of these interested parties would bid against each other". Petitioners' counsel asked only a hypothetical question about what would happen *if* there were interested parties, as is shown by the following colloquy:

Q. [Turkus.] That's precisely the point I'm trying to get to, Mr. Willitts [sic]. If there were in 1971 several potential willing buyers, and I'll just give you a few examples. I gather you didn't, from what you said you didn't look for any such buyers, but the Palmer College, the Palmer College Alumni perhaps as a separate institution; the International Chiropractic Association. If there were several interested parties out there who attached special significance to that property, then they wouldn't want—they would be bidding against each other in an attempt to buy the property. Isn't that correct?

A. [Willits.] That is correct.

After respondent's counsel objected that no foundation had been laid for the question, the following occurred:

MR. TURKUS: Your Honor, I'm attempting to explore what efforts the witness made to ascertain this information.

THE COURT: I'm treating Mr. Turkus's question as a hypothetical. If there are these people out there who are separate and are interest[ed] in separately bidding, then what's the result. Now, if Mr. Turkus is assuming these as being part of evidence that's already been established, that's another matter. So far I'm treating it as a hypothetical. Are you asking the question as a hypothetical?

MR. TURKUS: Yes, I am, Your Honor.

THE COURT: All right.

MR. TURKUS: And as I've said, I've asked it in reference to the question of what effort the witness has made to determine these facts.

BY MR. TURKUS (Resuming):

Q. I'll repeat the question, Mr. Willitts [sic]. If there were several willing buyers who were interested in the property because of its special, historical or whatever you would like to call it, significance, isn't it a fact that in the market they would be bidding against each other to purchase the property?

A. Could be.

Q. And wouldn't they—isn't that the way the market works?

A. That's right.

Q. And wouldn't they conceivably want to pay more for the property than somebody who wanted to put up a 7–11?

A. Probably. They would be paying for sentimental value, not market value.[14]

Thirdly, petitioners have failed to present evidence from which we could conclude that there would be any competitive bidding of the sort hypothesized by petitioners' counsel. Indeed, what evidence there is in the record, at the places in the transcript to which petitioners have directed our attention, suggest that petitioners' witnesses expected the college's alumni would support the college in any such hypothetical bidding, and not compete and drive up the price. Similarly, the fact that Mazzarelli was simultaneously chairman of the board of the college and chairman of the board of the International Chiropractors Association suggests to us that these two organizations would not compete

---

[14]We disagree with Willits' last comment. If bidders competed for "sentimental" reasons, then that, too, could establish fair market value, in the absence of doubt as to the bona fides of the bid.

and drive up the price. Petitioners have not suggested the existence of any other possible competitors.

Fourthly, Willits' testimony as to what D.D. Palmer would do if offered $79,000 for the property, was a response to a hypothetical question by petitioners' counsel.[15] Once again, the record suggests that there would not have been people bidding against the foundation above the $79,000 level. The predicate of petitioners' counsel's question is not supported by, but rather is contradicted by the record. Petitioners' description, on brief, of what Willits testified to is misleading, and largely erroneous.

We hold that the fair market value of the property on the date of its contribution to the foundation was $80,000.

In order to take account of this holding,

*Decision will be entered under Rule 155.*

[15]Q. [Turkus.] But if there were people out there who wanted to buy it for its historic significance and those people would have paid more for it; in fact, you've indicated that the appropriate way to value things for historic significance is cost approach, do you think Mr. Palmer should have sold it for less than the cost approach for what the land value alone would have been?
A. [Willits.] He probably would not have.
Q. Would he have been acting as a prudent seller to do so?
A. Not if there were people bidding against it.