**ESTATE OF D.D. PALMER, Deceased, Richard L. Braunstein and Davenport Bank & Trust Co., Executors and A.H. Palmer, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 86–2044.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1987.

Decided Feb. 11, 1988.

---

Albert H. Turkus, Washington, D.C., for appellants.

Jane S. Kimball, Tax Div., Washington, D.C., for appellee.

Before McMILLIAN, FAGG, and MAGILL, Circuit Judges.

FAGG, Circuit Judge.

A.H. Palmer and the Estate of D.D. Palmer (the Palmers) appeal a decision of the Tax Court in favor of the Commissioner of Internal Revenue (the Commissioner). The Tax Court confirmed income tax deficiencies against the Palmers resulting from partially disallowed charitable contribution deductions taken for the donation of property. We reverse and remand.

In 1971 D.D. Palmer donated a parcel of improved land in Davenport, Iowa, to the Palmer College Foundation (the Foundation). Our references to this donated property relate to its condition and use at the time of the donation. On their 1971 joint federal income tax return D.D. Palmer and his wife, A.H. Palmer, claimed a charitable contribution deduction for the donation, with the excess as a carryover deduction on their 1972 and 1973 returns. In 1978 the Commissioner assessed deficiencies against the Palmers for the 1971, 1972, and 1973 tax years based on a determination the fair

market value of the donated property, and consequently the amount of the charitable deduction, had been incorrectly calculated by the Palmers.

The Palmers petitioned the Tax Court for redetermination of the deficiencies. When D.D. Palmer died in 1978, his estate was substituted as a party in the Tax Court proceedings. After a trial in 1980 the Tax Court in 1986 issued its decision, which on the whole adopted the Commissioner's methods of valuing the property and calculating the charitable contribution deduction. *See Estate of D.D. Palmer v. Commissioner*, 86 T.C. 66 (1986).

D.D. Palmer's father, B.J. Palmer, was the son of Daniel David Palmer, who in the late 1800's discovered the principles of chiropractic. While continuing efforts to develop and popularize the profession begun by his father, B.J. Palmer lived and worked in Davenport, Iowa, where sometime between 1875 and 1885 he bought a three-story Victorian-style mansion on a one-half acre lot overlooking the Mississippi River. B.J. Palmer, and later D.D. Palmer, each lived in the mansion during the formative years of chiropractic, and the residence served as a dormitory and a gathering place for students and faculty.

Between 1912 and 1922 the basic structure of the mansion was modified by the construction of a non-Victorian, museum-like addition that more than doubled the size of the first floor. Some of B.J. Palmer's collections of art objects and chiropractic memorabilia were displayed and stored in the addition. Various other improvements were also added including a greenhouse and a courtyard. The land, the expanded mansion, the greenhouse, and the courtyard constituted the 1971 donation. None of the Palmers' collections, memorabilia, furnishings, or other personal property was included in the contribution.

The property donated by the Palmers is located amid the buildings and grounds of the Palmer College of Chiropractic (the College), the country's first chiropractic college, founded by B.J. Palmer. The mansion, which is adjacent to the main classroom and most of the other College build-ings, ceased to be occupied as the Palmer family residence after B.J. Palmer's death in 1961. After 1961, the first floor of the mansion has been used regularly by the College for graduation, alumni, and faculty functions. It has also been used for display of some of the Palmer personal property and for other social and ceremonial events. The upper two floors are in disrepair and not actively used other than for storage, and the College has considered the possibility of demolishing the greenhouse.

The property is located in a commercially zoned area near the heart of the Davenport business district where there is a critical need for convenient parking for business and college use. Between 1963 and 1980 the College spent nearly two million dollars to acquire nearby land, much of it for parking space. The College includes a maintenance allocation for the donated property in its annual operating budget. At the time of the donation, the Foundation planned to undertake a restoration program to perpetuate the mansion's use for college-related functions and as a museum and historic monument to chiropractic's origin and development. The College and the Foundation would also restore the mansion if it were damaged or destroyed. In addition, the College estimates twenty percent of its annual income is attributable to the role played by the mansion in College affairs and fund raising.

 Subject to certain maximum annual limitations that are not in dispute, the Palmers are permitted to take as a deduction the fair market value of property contributed to an eligible charitable donee. *See* 26 U.S.C. § 170(a)(1); 26 C.F.R. § 1.170A–1(c)(1) (current regulations) (changes since 1971 in section 170 and the accompanying regulations do not affect our analysis in this case). Fair market value generally is the price at which a willing buyer will purchase property from a willing seller, when neither is under any compulsion to buy or sell and both have reasonable knowledge of the relevant facts and circumstances. *See Orth v. Commissioner*, 813 F.2d 837, 841 (7th Cir.1987); *Palmer v. Commissioner*, 523 F.2d 1308, 1310

(8th Cir.1975); *see also* 26 C.F.R. § 1.170A–1(c)(2).

■ Initially, we note the basic principles that guide our review of the Tax Court's decision. The Tax Court's findings of fact are reviewed under the clearly erroneous standard. *Orth,* 813 F.2d at 838. The ultimate determination of fair market value is a finding of fact. *See id.* at 842. The question of what criteria should be used to determine value is a question of law subject to de novo review. *See Estate of Shafer v. Commissioner,* 749 F.2d 1216, 1218 (6th Cir.1984); *Palmer,* 523 F.2d at 1310 (citing *Powers v. Commissioner,* 312 U.S. 259, 260, 61 S.Ct. 509, 510, 85 L.Ed. 817 (1941)). The use to which property may be put is a pertinent fact in determining the property's fair market value. *Guggenheim v. Rasquin,* 312 U.S. 254, 257, 61 S.Ct. 507, 508, 85 L.Ed. 813 (1941); *Krauskopf v. Commissioner,* 48 T.C.M. (CCH) 622, 627 (1984). Usage is pertinent, however, only within the context of those uses "to which [the property] may reasonably be put." *Douglas Hotel v. Commissioner,* 190 F.2d 766, 772 (8th Cir.1951). Although the Tax Court's determination of fair market value is accorded deference as a finding of fact, " 'it does not render [our review] a mere rubber stamp.' " *Akers v. Commissioner,* 798 F.2d 894, 897 (6th Cir.1986) (quoted citation omitted); *see also Estate of Goodall v. Commissioner,* 391 F.2d 775, 786 (8th Cir.), *cert. denied,* 393 U.S. 829, 89 S.Ct. 96, 21 L.Ed.2d 100 (1968).

The Tax Court found that on the date of donation the fair market value of the Palmer land, valued as if vacant and ready for commercial development, was $79,000. *Estate of D.D. Palmer,* 86 T.C. at 72, 76. To arrive at a value for the improvements, the Tax Court utilized a market data approach known as the comparable sales method. This method "is based on the commonsense approach of taking the actual sales price of * * * properties similar to the subject property and then relating these prices to the subject property." *Id.* at 72 n. 10. Using this method the Tax Court considered sales of conventional single family Victorian residences in the Davenport community rang-

ing between $34,000 and $38,500 for the land and residence selling as a unit. *Id.* at 72. The Tax Court thus concluded the improvements on the Palmer land essentially had no value because a seller would receive more in the open market for the vacant lot alone than for the land and improvements together. *See id.* at 73. Accepting the $79,000 value of the land as the maximum obtainable for both the land and improvements, and recognizing the resolve of the College and its related organizations and alumni to retain control of the property, the Tax Court fixed the fair market value of the donated property at $80,000. *Id.* at 76, 79.

■ The Palmers challenge the Tax Court's determination of fair market value, claiming the component of their donation represented by the improvements has yet to be valued properly. The Palmers contend no factual basis exists in the record for a comparison between the mansion and conventional single family Victorian residences. We agree.

The Tax Court's determination of the fair market value of the donated property is premised on an untenable factual finding that the "highest and best use [for the mansion] would be as a single family residence." *Id.* at 72. Although the court recognized the mansion was no longer used as a residence, *id.* at 69, it nevertheless focused on its usage in a bygone era. The Tax Court simply closed its eyes to undisputed evidence that after 1961, and at the time of the donation, the mansion served as a unique, vital College building; it was the hub of faculty, alumni, ceremonial, social, and fund raising activities; and plans were in place to perpetuate its role as an integral part of the College. Thus, we are " 'left with the definite and firm conviction that a [factual] mistake has been committed' " by the Tax Court. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

█ Inescapably, the Tax Court's erroneous characterization of the Palmer mansion as residential led it to select the wrong method of valuation in arriving at its fair market value determination. We have no quarrel with the valuation technique based on the comparable sales method. *See Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19–20 (1979). This method has validity, however, only when the properties that provide the market benchmark have qualities substantially similar to the property for which a value is sought. *See Cullers v. Commissioner*, 237 F.2d 611, 615 (8th Cir.1956); *Wolfsen Land & Cattle Co.*, 72 T.C. at 19–20. The record here shows the Palmer mansion's residential character had been discontinued long before the donation, nor is there any reasonable prospect of future residential usage. Hence, the mansion was not substantially similar to conventional single family Victorian residences and its value cannot be determined by comparing it to those properties. Consequently, we conclude the Tax Court's finding of fair market value of the donated property is clearly erroneous.

█ We must now consider how properly to determine the fair market value of the Palmer donation. The parties agree a method geared to income capitalization is not applicable here. Nor is it as simple as locating local comparable properties—there apparently are none. However, the record demonstrates the donated property functions as an integral part of the College and possesses unique qualities that are highly important to chiropractic—indeed, the Tax Court recognized these qualities when it acknowledged "the shrine aspect of the property." *Estate of D.D. Palmer*, 86 T.C. at 73. Understandably, this property generates market interest in only a limited number of parties—the College and its related organizations and alumni. Even so, neither uniqueness nor a limited market is a barrier to determining value. *See Cupler v. Commissioner*, 64 T.C. 946, 955 (1975); Rev.Proc. 66–49, 1966–2 C.B. 1257, 1257; *see also Krauskopf*, 48 T.C.M. (CCH) at 627.

█ The Palmers presented evidence of the cost of reproducing the improvements with adjustments for depreciation, and they argue this evidence should have been considered by the Tax Court in ascertaining value. We agree. Reproduction cost is a relevant measure of fair market value when the property to be valued is unique, its market limited, and when there is no evidence of sales of comparable properties. *See, e.g., Krauskopf*, 48 T.C.M. (CCH) at 628–29; *First Wis. Bankshares Corp. v. United States*, 369 F.Supp. 1034, 1039 (E.D.Wis.1973). For the reproduction cost appropriately to have an impact on the value equation, the taxpayer must establish "a probative correlation between [it] and fair market value." *Rainier Cos., Inc. v. Commissioner*, 36 T.C.M. (CCH) 1404, 1406 (1977); *see also* Rev.Proc. 66–49 at 1258. We believe the Palmers have demonstrated this relationship.

Even so, we decline to fix fair market value at what the Palmers claim to be the undisputed cost of reproduction. The Tax Court should have the opportunity to consider evidence of reproduction cost in light of all relevant evidence of the donated property's value. We do not suggest the reproduction cost method will be wholly determinative of value in this case, but only that it is a pertinent factor to be considered in the fair market value analysis. *See* Rev. Proc. 66–49 at 1257.

Accordingly, we reverse and remand this case to the Tax Court for further proceedings consistent with this opinion.