ESTATE OF D. D. PALMER, DECEASED, RICHARD L. BRAUNSTEIN AND DAVENPORT BANK & TRUST CO., EXECUTORS, AND A. H. PALMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Palmer v. Commissioner
Docket No. 3775-78
United States Tax Court
T.C. Memo 1992-48; 1992 Tax Ct. Memo LEXIS 53; 63 T.C.M. (CCH) 1907; T.C.M. (RIA) 92048; January 27, 1992, Filed *53 Decision will be entered under Rule 155. Decedent donated certain land and improvements to the Palmer College Foundation, an eligible charitable donee. This Court concluded that reproduction cost was unrelated to fair market value in this case. The Court of Appeals remanded the case, directing us to consider reproduction cost as "a pertinent factor" in determining fair market value. Held, reproduction cost of the improvements determined; fair market value of the contributed property determined. Sec. 170(a)(1), I.R.C. 1954. Albert H. Turkus and Bernard J. Long, Jr., for petitioners. Clement Shugerman, for respondent. CHABOT, Judge. CHABOT
SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION This case is now before us on remand from the Court of Appeals for the Eighth Circuit for further consideration consistent with the Court of Appeals' opinion. Estate of Palmer v. Commissioner, 839 F.2d 420 (8th Cir. 1988), revg. and remanding 86 T.C. 66 (1986). Specifically, the Court of Appeals directs us to consider the reproduction cost of the improvements to certain donated property in reconsidering the fair market value of *54 the donated property. In our prior opinion this Court held that the fair market value, as of August 25, 1971, of certain improved real property that petitioners donated to the Palmer College Foundation (hereinafter referred to as the Foundation) (an eligible charitable donee under section 170(c)(2) of the Internal Revenue Code of 1954) was $ 80,000. Estate of Palmer v. Commissioner, 86 T.C. at 70, 79. The donated property (hereinafter referred to as the property) consists of a half-acre lot (hereinafter referred to as the land) improved by a three-story building (hereinafter referred to as the mansion), a museum (hereinafter referred to as the museum), and a two-story garage. 86 T.C. at 67. In our holding, we valued the property using the comparable sales method, and rejected petitioners' reproduction cost method. 86 T.C. at 76. On appeal, the Court of Appeals for the Eighth Circuit held that: (1) It was error to determine fair market value on the basis of comparable sales of single family Victorian residences where the mansion was not used as a residence, but was a hub of campus activity, 839 F.2d at 423, [1] *55 and (2) evidence of the cost of reproducing improvements with adjustments for depreciation should have been taken into account in determining fair market value, 839 F.2d at 424. Accordingly, the Court of Appeals reversed and remanded the case to this Court for redetermination of fair market value. The Court of Appeals chose to limit its specific instructions in making such a redetermination to the following, Estate of Palmer v. Commissioner, 839 F.2d at 424: we decline to fix fair market value at what the Palmers claim to be the undisputed cost of reproduction. The Tax Court should have the opportunity to consider evidence *56 of reproduction cost in light of all relevant evidence of the donated property's value. We do not suggest the reproduction cost method will be wholly determinative of value in this case, but only that it is a pertinent factor to be considered in the fair market value analysis. SeeRev. Proc. 66-49 [1966-2 C.B.] at 1257.
In light of the above instructions, we must now redetermine the fair market value of the property. On remand, and pursuant to an Order by this Court, the parties filed further memoranda of law with this Court. This Court also heard oral argument in regard to how reproduction cost should be taken into account according to the Court of Appeals' directive. The parties declined to introduce any additional evidence. Detailed findings of fact are set out in our prior opinion. 86 T.C. at 66-70. As background, we will briefly summarize certain facts as set out in our prior opinion. In 1912 B. J. Palmer, the founder of the Palmer College of Chiropractic (hereinafter referred to as the College), bought the land and the mansion for use as a family residence. He expanded the mansion and added the museum. The museum, *57 called "A Little Bit O' Heaven", consists of a conservatory (hereinafter referred to as the conservatory) and a courtyard (hereinafter referred to as the courtyard). B.J. Palmer's father, Daniel David Palmer, was the discoverer of the principles of chiropractic and founder of the chiropractic profession. B.J. Palmer was very instrumental in the growth of the chiropractic profession. The property is associated with the early history and development of the chiropractic profession. The property is on the same city block as the College, and is immediately adjacent to the College. B.J. Palmer died in 1961; since his death the first floor of the mansion has been used by the College for ceremonial and alumni functions and for the display of art objects and chiropractic memorabilia. During this period, the second and third floors have generally been closed and have been used for storage purposes. On August 25, 1971, B.J. Palmer's son, D.D. Palmer, donated the property to the Foundation (which owns and operates the College). Respondent, alleging that the property had been overvalued on petitioners' [2] tax returns, determined deficiencies in Federal individual income tax against petitioners *58 as follows: Year [3]
Deficiency
1971
$ 41,865.79
1972
76,171.10
1973
25,992.78
The findings of fact set out in our prior opinion are incorporated herein by this reference, as hereinafter modified and augmented. The stipulations and stipulated exhibits are also incorporated herein by this reference. We make the following additional findings of fact. ADDITIONAL FINDINGS OF FACT Valuing the property as though its highest and best use were as a single-family residence and using a market data approach, the value of the property in 1971 was between $ 34,000 and $ 38,500. Of the mansion, only the first floor was used for campus activities. The mansion was somewhat functionally obsolete as a hub of campus activity. The conservatory was economically and functionally obsolete as a greenhouse. As the property was being *59 used at the time of the donation, the market for purchase of the property was limited to the chiropractic community.
The reproduction cost of the mansion is $ 130,000. The reproduction cost of the conservatory is $ 51,500, and the reproduction cost of the courtyard is $ 33,500, for a total reproduction cost of the museum of $ 85,000. The total reproduction cost of the mansion and museum is $ 215,000. The garage has no value. [4]
The fair market value of the property is $ 187,000, being the sum of the fair market value of the land ($ 79,000) and one-half of the reproduction cost of the improvements (1/2 X $ 215,000 = $ 107,500; the latter being then rounded to three significant figures, or $ 108,000). OPINION The parties still have not agreed on the fair market value of the property, and so we will have to find the fair market value. *60 Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 451-452 (1980). In order to determine fair market value in the instant case, we must first determine the reproduction cost of the mansion and the museum. We will then take reproduction cost into account to determine the fair market value of the property, in accordance with the Court of Appeals' mandate. [5]
*61 I. Reproduction Cost
Respondent contends that in taking reproduction cost into account, our consideration should be limited to the reproduction cost of the mansion only, contending that the museum is functionally obsolete. Respondent further contends that reproduction cost of the mansion should be limited to the first floor of the mansion, since the upper floors are not in use. Respondent contends that the reproduction cost of the first floor of the mansion, after reductions for depreciation, is between $ 66,000 and $ 77,000. Petitioners contend that the reproduction cost of the property is $ 441,500 ($ 305,000 for the mansion and $ 136,500 for the museum). Petitioners contend that we are bound to accept the reproduction cost as calculated by petitioners' expert witnesses because that is the only evidence in the record as to reproduction cost. [6]
*62 We do not agree with respondent's contention that we should consider only the reproduction cost of the first floor of the mansion; however, we conclude that the mansion and the museum should be discounted for some obsolescence. Also, we do not accept petitioners' asserted reproduction cost. Further, we are not bound to accept petitioners' expert witness' appraisals, even if those appraisals are the only opinion evidence in the record as to reproduction cost. Cupler v. Commissioner, 64 T.C. 946, 955-956 (1975). Moreover, we may choose to accept an element of one expert's report, and another element of another expert's report. Parker v. Commissioner, 86 T.C. 547, 562 (1986). We agree with respondent in part, and with petitioners in part. A. The Mansion
We begin by determining the reproduction cost of the mansion. Petitioners presented at trial the testimony of two expert witnesses. Their first expert witness, Edmund C. Fisher (hereinafter referred to as Fisher), is a real estate appraiser. Fisher made a written appraisal of the property in 1971, just a few months before the donation. Fisher used the reproduction cost approach *63 to value the property. As to the mansion, Fisher used the following three separate methods to determine reproduction cost: (1) Boeckh's Building Valuation Manual, (2) the known cost of a newly-constructed comparable residence, and (3) a "cost new" estimate from a building contractor. All three methods produced a cost to reproduce the mansion of about $ 190,000. Fisher subtracted from this amount $ 25,000 for deferred maintenance. Fisher also estimated that the value of the mansion should be reduced by 35 percent for physical depreciation, leaving a reproduction cost of $ 107,250. Fisher's appraisal did not consider the cost of reproducing certain ornate decorative accents contained in the mansion, such as the woodwork (wood trim and wooden doors), and special glasswork (leaded and beveled glass). Fisher did not reduce the reproduction cost of the mansion for economic or functional obsolescence. Petitioners also introduced testimony by an expert witness, Harold J. Stewart (hereinafter referred to as Stewart), an architect, as to the value of the mansion. Petitioners retained Stewart in 1979 to determine the reproduction cost of the mansion, including the woodwork and special *64 glasswork. Stewart concluded that the reproduction cost of the mansion in 1971 was $ 426,897. Stewart determined this amount by estimating that in 1979 the basic structure of the mansion would cost $ 50 per square foot to reproduce, for a total of $ 516,500. Stewart testified that in 1979 it would cost $ 200,000 to reproduce the woodwork, and that the special glasswork would cost $ 17,000 to reproduce in 1979. Stewart determined the total cost to reproduce the mansion in 1979 would be $ 733,500. In order to determine a reproduction cost for 1971, Stewart applied a cost index of 58.2 percent from the Robert Snow Means manual. The cost index of 58.2 percent, applied to $ 733,500, gave a 1971 reproduction cost for the mansion of $ 426,897. This figure did not include the value of the land, or the value of improvements other than the mansion. In determining reproduction cost of the mansion, we will first consider the cost to reproduce the basic structure of the mansion, and then we will consider the woodwork and glasswork. As to the cost to reproduce the basic structure of the mansion, the appraisal by Fisher is the most credible evidence in the record. [7] The appraisal was contemporaneous *65 with the donation, and was thorough and detailed. Fisher's use of three different methods to determine cost to reproduce the mansion, each of which arrived at a cost approximating $ 190,000 (which was then reduced to $ 107,250 for deferred maintenance and physical depreciation), tends to confirm the accuracy of that value. In contrast, Stewart's testimony in regard to the cost to reproduce the mansion is lacking in detail. Stewart's testimony in regard to the cost to reproduce the basic structure of the mansion (without considering the cost of the woodwork and special glasswork), is based on a cost per square foot, and application of a general cost index for 1971. Stewart's methodology would result in a 1971 cost of $ 300,603 for the basic structure of the mansion alone, in contrast to Fisher's estimate of $ 107,250. Stewart did not reduce this figure for any depreciation, deferred maintenance, or obsolescence. We give little weight *66 to Stewart's appraisal because it is not supported by a written report, [8] and because it lacks the detail and credibility contained in Fisher's report. Fisher's estimate was corroborated by the use of three different methods, each of which reached about the same amount. We accept Fisher's estimate of the cost to reproduce the mansion new less physical depreciation and deferred maintenance ($ 107,250); however, Fisher did not reduce that cost by any functional or economic obsolescence. Fisher testified that the mansion was not functionally obsolete because, as a shrine, the mansion functions fine. He also concluded that the mansion was *67 not economically obsolete. Respondent's expert witness, Willits, testified that the mansion was functionally obsolete because only the first floor was being used. We believe that the mansion was somewhat functionally obsolete as used by the College, since only the first floor of the mansion was in use as a shrine and that some reduction for functional obsolescence should be applied. Accordingly, we conclude that the reproduction cost of the basic structure of the mansion is $ 90,000. As to the cost of reproducing the woodwork and the special glasswork in the mansion, Stewart's testimony is the only evidence in the record. Stewart's testimony is based on estimates which he obtained from specialists in woodwork and glasswork fields, rather than from his own experience. [9] *69 Neither the $ 200,000 estimate for the woodwork, nor the $ 17,000 estimate for the glasswork is detailed or broken down in any way. Although Stewart's resume, and that of the woodwork specialist he relied on, may be impressive, the lack of articulation of factual underpinnings and reasoning prevents us from properly evaluating the conclusions Stewart reported to us. [10] Accordingly, we give little weight to Stewart's *68 appraisal of these items. Although Fisher's appraisal did not include the value of these items, petitioners' attempt to cure this failure by Stewart's testimony is ineffectual. However, it is evident that the woodwork and special glasswork add some value to the mansion and would be expensive to reproduce. Under these circumstances, the inadequacy of the record would not justify our ignoring the woodwork and special glasswork altogether. Helvering v. Taylor, 293 U.S. 507, 515 (1935); Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Doing the best we can with the record in the instant case, we conclude that we should add $ 40,000 to the cost to reproduce the mansion, which amount represents the value of the woodwork and special glasswork. We hold that the reproduction cost for the mansion is $ 130,000 ($ 90,000 for the basic structure; $ 40,000 for the woodwork and special glasswork). B. The Museum
Fisher's report determined the cost to reproduce the museum to be $ 136,669. Of this amount, $ 103,169 is attributable to the conservatory, and $ 33,500 is attributable to the courtyard. Fisher discounted the conservatory and courtyard for physical depreciation, but he did not discount these improvements for any obsolescence; however, at trial Fisher testified that, as a conservatory, the conservatory was both functionally and economically obsolete. Fisher testified that *70 he did not know of anyone who would purchase the conservatory for use as a greenhouse. We conclude that the cost of reproducing the conservatory should be discounted by 50 percent because of its obsolescence. We conclude that the cost of reproduction of the conservatory is $ 51,500, and the cost of reproducing the courtyard is $ 33,500. We therefore conclude that the cost of reproduction of the museum is $ 85,000 ($ 51,500 for the conservatory; $ 33,500 for the courtyard). Petitioners contend that the cost of reproduction of the mansion and museum is $ 441,500. To arrive at this figure, petitioners combine certain figures used by each of their expert witnesses. Petitioners then make an independent calculation. Petitioners contend the value of the mansion is $ 305,000. To arrive at this figure, petitioners begin with Stewart's 1971 valuation of the mansion of $ 426,000. [11] They subtract $ 96,000 of depreciation, [12] and $ 25,000 of deferred maintenance, which gives the mansion a value of $ 305,000. To this amount petitioners add $ 136,500, the value of the museum as determined by Fisher, for a total reproduction cost of $ 441,500. Neither of petitioners' expert witnesses *71 placed this value on the property. Petitioners are attempting to cure the weaknesses of each appraisal by combining methods and amounts from separate appraisals. Although this approach may have theoretical merit in general, we have difficulties with its application in the instant case. We note that petitioners rely heavily on Stewart's testimony for their calculations, whereas we have decided that little weight should be given to Stewart's testimony. Further, we believe that certain discounts for obsolescence should be applied to the mansion and the museum. Petitioners did not include discounts for obsolescence in their calculations. We reject petitioners' asserted value. *72 We hold (and we have found) that the reproduction cost of the improvements is as follows: $ 130,000 for the mansion, and $ 85,000 for the museum, for a total reproduction cost of $ 215,000. We hold in part for petitioners and in part for respondent on this issue. II. Fair Market Value
The Court of Appeals stated that reproduction cost of the improvements should be taken into account in determining fair market value, but should not be wholly determinative. Estate of Palmer v. Commissioner, 839 F.2d 420, 424 (8th Cir. 1988), revg. and remanding 86 T.C. 66 (1986). On remand, both sides urge us to ignore selected portions of the Court of Appeals' opinion. Respondent contends that the Court of Appeals merely wants us to come up with a larger number, and that the Court of Appeals' discussion of reproduction cost was merely a veneer; a de minimis increase of 10 percent (to bring our previous valuation of $ 80,000 up to $ 88,000) should do the job, respondent argues. Petitioners maintain that the Court of Appeals wants us to find that reproduction cost is fair market value, notwithstanding the passage from the Court of Appeals' opinion *73 quoted above. In addition, the parties disagree as to the value of the land if reproduction cost is used for the improvements; respondent contends that it is $ 2,000 to $ 2,500, while petitioners argue for $ 79,000. We disagree with both sides as to the improvements. We agree with petitioners as to the land. A. Improvements
The fair market value of a property is the price at which a willing buyer would buy the property from a willing seller, when neither is acting under compulsion and both are fully informed of the relevant facts and circumstances. E.g., Palmer v. Commissioner, 523 F.2d 1308, 1310 (8th Cir. 1975), affg. 62 T.C. 684, 696 (1974); McShain v. Commissioner, 71 T.C. 998, 1004 (1979). As in our first opinion, we note that valuation is not a precise science, and the determination of the fair market value of property on a given date is a question of fact, Kaplan v. Commissioner, 43 T.C. 663, 665 (1965), to be resolved on the basis of the entire record, McShain v. Commissioner, 71 T.C. at 1004, and without necessarily being bound by the opinions of the expert witnesses, *74 Palmer v. Commissioner, 523 F.2d at 1310. The Court of Appeals states that evidence of reproduction cost should be considered in light of all relevant evidence of the property's value. The Court of Appeals directs our attention to Rev. Proc. 66-49, 1966-2 C.B. 1257, which provides guidelines for appraising donated property. Sections 2.04 and 2.07 of the Rev. Proc. state as follows: .04 As to the measure of proof in determining the fair market value, all factors bearing on value are relevant including, where pertinent, the cost, or selling price of the item, sales of comparable properties, cost of reproduction, opinion evidence and appraisals. Fair market value depends upon value in the market and not on intrinsic worth. .07 With respect to reproductive cost as a measure of fair market value, it must be shown that there is a probative correlation between the cost of reproduction and fair market value. Frequently, reproductive cost will be in excess of the fair market value. [1966-2 C.B. at 1257, 1258.]
The Court of Appeals concludes that petitioners have demonstrated in the instant case that there *75 is a probative correlation between reproduction cost and fair market value. The consequence in the instant case, the Court of Appeals directs us, is that "reproduction cost appropriately * * * [has] an impact on the value equation". 839 F.2d at 424 (emphasis added). We now proceed to determine the amount of this "impact". In determining fair market value, we must consider all relevant evidence. In the instant case we note that the comparable sales approach to value indicates that the property, if it were to be sold as a residence, would have had a fair market value of $ 34,000 to $ 38,500. As discussed in our prior opinion, valuing the property as if it were vacant and available for commercial development, the comparable sales approach gives the property a fair market value of $ 79,000. Estate of Palmer v. Commissioner, 86 T.C. at 72. We note that the treatise that was entered as an exhibit states that when possible all three approaches to valuation should be used to check against each other. American Institute of Real Estate Appraisers, The Appraisal of Real Estate 65 (7th ed. 1978). Thus, it is valid to consider comparable sales *76 as relevant evidence. We are aware that the Court of Appeals rejected the exclusive use of the comparable sales method in the instant case. 839 F.2d at 423. Our consideration of comparable sales is limited to noting whether comparable sales data confirms reproduction cost as fair market value. In the instant case, the comparable sales method of valuation does not confirm that reproduction cost represents fair market value; rather, the comparable sales approach demonstrates a comparatively low fair market value for the property. An important consideration in our fair market value analysis is that the market for the property -- as a shrine -- is very limited, consisting only of the Foundation, and organizations associated with the chiropractic profession. These entities have harmonious relations, 86 T.C. at 70, and there is no basis to conclude that in a hypothetical auction, these entities would bid against each other, driving the purchase price of the property to an amount much greater than the price the property would command absent its unique nature. 86 T.C. at 75-79. As we construe the Court of Appeals' opinion, we believe *77 the Court of Appeals concluded that some value should be given to the mansion and museum in addition to the value of the vacant land, but that our determination of the total fair market value of the property should not exceed the property's actual market value. As stated in Rev. Proc. 66-49, "Fair market value depends upon value in the market and not on intrinsic worth." Rev. Proc. 66-49, sec. 2.04, 1966-2 C.B. at 1257. The record does not support a conclusion that the entire $ 215,000 reproduction cost of the mansion and museum should be added to the value of the land to determine the property's fair market value. We believe this would greatly overstate the property's actual value on any market, including the chiropractic community market. Considering all the relevant evidence, we conclude that in determining the fair market value of the property, the reproduction cost ($ 215,000) should be taken into account to the extent of one-half of that cost, or $ 107,500, rounded to $ 108,000. On remand, petitioners express concern that we not "be tempted to make a 'Solomonic' valuation in an attempt to *78 bridge the gap between Petitioners and Respondent." Presumably, petitioners refer to King Solomon's famous truth-seeking trick detailed in I Kings 3:16-28. We assure the parties that our analysis is born solely of our duty to comply with the instructions of the Court of Appeals. If the parties had not eschewed the opportunity we gave them to supplement the record, but instead had provided us with evidence that would focus on the appropriate relationship between reproduction cost and fair market value in the instant case, then perhaps we would have arrived at a different result. Our analysis must deal with the record as the parties have created it and not necessarily as the parties would have us view it. We hold that the fair market value of the improvements aspect of the property is $ 108,000. B. Total
Expert witnesses for both sides testified that, when using the reproduction cost method, it is appropriate to value the land as if vacant, and to separately value the improvements. The parties stipulated "that the portion of the Property consisting solely of the land had a fair market value of $ 79,000 as of the date of donation." From this, we conclude that the total fair *79 market value of the property is $ 187,000 ($ 108,000 (half the reproduction cost of the improvements) plus $ 79,000 (the value of the land)). However, respondent points to Willits' testimony that "if it's [i.e., the property is] going to be used as a residence it [i.e., the land alone] would probably be in the $ 2,000 to $ 2,500 price range." Respondent asserts that "the usage that most resembles the usage determined by the Eighth Circuit is residential." From the foregoing, respondent concludes that no more than $ 2,500 should be added to the reproduction cost of the improvements. Respondent overlooks our findings that, although the mansion was used as a residence until B.J. Palmer's death in 1961, 86 T.C. at 68, "From 1961 onward, the first floor of the mansion was used by the college for ceremonial and alumni functions and for the display of art objects and chiropractic memorabilia." 86 T.C. at 69. Thus, the mansion had been used as a shrine, and not as a residence, for a decade by the time decedent contributed the property. It was the shrine use, and not the residence use, to which the mansion would be put after the contribution. Under these *80 circumstances, it would be inappropriate to value the land -- or any part of the property -- by reference to residential values. On the contrary, the testimony of the expert witnesses and the stipulation of the parties make it clear that, if the land were offered for sale, then any potential shrine use purchaser of the land would have to contend with potential commercial bidders up to $ 79,000. We conclude that, in determining the fair market value of the property taking into account the reproduction cost method, we should value the land at $ 79,000 and add that amount to the $ 108,000 value we have found for the improvements. We hold in part for petitioners and in part for respondent. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. In our opinion, Estate of Palmer v. Commissioner, 86 T.C. 66, 72-73, 76↩ (1986), we made it clear that we were not determining fair market value on the basis of comparable sales of single-family Victorian residences, and the value we determined was more than twice what the property would have fetched if sold as a single-family residence.
2. D.D. Palmer died in May, 1978; thereafter, his estate was substituted as a petitioner. ↩
3. The deficiencies for 1972 and 1973 are due to disallowed carryover contribution deductions.↩
4. Petitioners' expert witness determined that the garage had no value. Neither side contends that the garage should be given any value. Accordingly, we give the garage no value.↩
5. Reproduction cost is the current cost of reproducing or replacing a property, less loss in value from deterioration and functional or economic obsolescence (sometimes referred to as accrued depreciation). American Institute of Real Estate Appraisers, The Appraisal of Real Estate 65 (1978). In determining that reproduction cost should be considered in the instant case, the Court of Appeals noted that the property functions as an integral part of the College, that it possesses unique qualities that are highly important to chiropractic, and that the property would generate interest in only a limited market. Estate of Palmer v. Commissioner, 839 F.2d 420, 424 (8th Cir. 1988). In our first opinion, we mentioned the shrine aspect of the property. Estate of Palmer v. Commissioner, 86 T.C. 66, 73↩ (1986). The property's unique qualities are not the qualities which we must attempt to value; rather, these qualities may result in a lack of market data and may necessitate the use of the reproduction cost as a factor in valuation.
6. Respondent's appraiser, Willits, did not value the property using the reproduction cost method. Thus as to the reproduction cost, petitioners' expert witness' opinions are the only evidence in the record. As noted supra↩, on remand, the parties chose not to reopen the record for additional evidence.
7. Respondent does not contend that Fisher's written appraisal is inaccurate.↩
8. The Tax Court Rules of Practice and Procedure relating to expert witness reports have been modified several times since the trial in the instant case. At that time, the Rules did not require expert witnesses to produce written reports. However, the parties were informed at trial that the absence of a written report would affect the weight to be given to Stewart's testimony.↩
9. Respondent objected to this part of Stewart's testimony as hearsay. The Court allowed the testimony, because it is customary for architects to consult other specialists in order to arrive at appropriate cost estimates, but informed the parties that respondent's inability to question the specialists Stewart relied on (because Stewart did not submit a written report) would affect the weight to be given to Stewart's testimony. 10. See 15 Mertens, Law of Federal Income Taxation, sec. 59.08, at 26 (1989). A common fallacy in offering opinion evidence is to assume that the opinion is more important than the facts. To have any persuasive force, the opinion should be expressed by a person qualified in background, experience, and intelligence, and having familiarity with the property and the valuation problem involved. It should also refer to all the underlying facts upon which an intelligent judgment of valuation should be based. The facts must corroborate the opinion, or the opinion will be discounted. [Fn. refs. omitted.]↩
11. Petitioners round certain figures in their calculations. Stewart testified that the mansion had a cost of reproduction of $ 426,897, and Fisher's appraisal gave the museum a cost of reproduction of $ 136,668. Petitioners round these numbers to $ 426,000, and $ 136,500. ↩
12. Petitioners make an independent calculation of the depreciation attributable to the mansion. Petitioners begin with Stewart's testimony that the mansion would have cost $ 426,000 to reproduce in 1971. However, Stewart did not reduce this amount by depreciation. Petitioners determine depreciation as follows. First they calculate that 58.2 percent of the $ 217,000 cost of reproducing the woodwork and the special glasswork, is $ 126,294, rounded to $ 126,000. This $ 126,000 is subtracted from $ 426,000 for a difference of $ 300,000. (By this calculation, petitioners are assuming that the woodwork and glasswork suffered from no physical depreciation. The record does not entirely support this assumption). From this amount, petitioners subtract $ 25,000 for deferred maintenance, for a difference of $ 275,000. Applying a 35-percent depreciation discount, petitioners determined a depreciation allowance of $ 96,000 for the mansion ($ 275,000 X 35% = $ 96,250, rounded to $ 96,000).↩