NORTON W. and VIRGINIA A. MAILMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mailman v. Commissioner
Docket No. 45238-86.
United States Tax Court
T.C. Memo 1989-88; 1989 Tax Ct. Memo LEXIS 77; 56 T.C.M. (CCH) 1380; T.C.M. (RIA) 89088; February 28, 1989. Richard S. Kestenbaum and Bernard S. Mark, for the petitioners. Victoria Wilson Fernandez and Rose E. Gole, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: This case was assigned *78 to Special Trial Judge Carleton D. Powell pursuant to the provisions of section 7443A(b) of the Internal Revenue Code of 1986 and Rule 180 et seq.[1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special Trial Judge: Respondent determined deficiencies in petitioners' 1981 and 1982 Federal income tax liability in the amounts of $ 204,395 and $ 100,756, respectively. The issues for decision are (1) whether petitioners are entitled to a charitable contribution deduction in 1981 and a carryover deduction in 1982 for the transfer of stock and notes to a charitable corporation, and if so, (2) the value of the contribution. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein. Petitioners resided in Glen Cove, New York *79 when they filed their petition. Background
Norton Mailman (petitioner) owned, at all relevant times herein, 54,250 shares (24.7 percent) of the 219,500 issued and outstanding shares of common stock in World Health Administrative Services, Inc. (WHASI), a "for profit" corporation. WHASI, incorporated in the State of New York on March 1, 1973, was organized to operate as an ambulatory medical center. On September 23, 1974, WHASI entered into a lease agreement (Lease) with the Port Authority of New York and New Jersey (Port Authority) for the occupancy of Suite 367, 5 World Trade Center (WTC), located in Manhattan's Financial District. The Lease was for a term of 21.3 years, and covered 12,430 rentable square feet in the WTC that could be used only as a medical facility. The Lease contained a non-assignment clause, and provided that the tenant could sublet space to physicians, dentists and other medical professionals, subject to the consent of the Port Authority. Under the Lease, WHASI was required to remit to the Port Authority any rent received from a sublessee in excess of the amount WHASI was paying to the Port Authority. Because of the Port Authority's desire to have *80 a medical facility at the WTC, WHASI's rent under the Lease was less than the rent charged for other office space at the WTC. Also, there was an understanding that WHASI had the "de facto exclusive" right to maintain a medical group at the WTC. In 1976, WHASI received a license pursuant to Article 28 of the Public Health Law of New York to operate as a diagnostic and treatment center, and subsequently commenced business in the WTC in May 1976. Also in 1976, sixteen of WHASI's stockholders formed World Health Association (WHA), a partnership whose assets consisted of medical equipment, furniture and fixtures that were leased to WHASI. Beginning in 1978, WHASI subleased office space to various physicians and dentists. By 1979 WHASI operations consisted of operating x-ray equipment and subleasing space to other doctors. WHASI, however, was not providing many types of medical services that had been envisioned. Throughout its existence WHASI incurred losses from its operations. Subsequent to the original lease with the Port Authority, WHASI entered into supplemental lease agreements with the Port Authority on September 23, 1974 (Supplement No. 1), February 1, 1979 (Supplement *81 No. 2), and December 31, 1979 (Supplement No. 3). Supplement No. 3 reduced the square feet under the Lease to 9,538, effective January 1, 1980. The base rental rate per Supplement No. 3 was as follows: Term
Annual Base Rent
Per Sq. Ft.
1/1/80 - 4/30/81
$  79,548
$  8.34
5/1/81 - 4/30/86
86,988
9.12
5/1/86 - 4/30/91
95,208
9.98
5/1/91 - 4/30/96
104,064
10.91
5/1/96 -
113,998
11.95
Supplement No. 3 also added a payment schedule [2] for rent arrearages of $ 170,077.89 incurred by WHASI as of December 31, 1979. The provision limiting WHASI's use of the premises for a medical facility remained in effect. In 1980, petitioner and Louis DiCerbo, on behalf of the WHASI stockholders, offered to "donate" all of the WHASI stock to St. Vincent's Hospital and Medical Center of New York (St. Vincent's). St. Vincent's is a section 501(c)(3) tax-exempt organization. WHASI's offer generated considerable debate among individuals associated with St. Vincent's. Some viewed the WTC location as an opportunity *82 to establish a presence in the Financial District, hoping that this would result in additional referral patients to St. Vincent's Hospital. Conversely, others viewed WHASI as a "white elephant," and felt that it would result in only a minimal increase in patients while subjecting St. Vincent's to potential liabilities. St. Vincent's ultimately agreed to accept the WHASI stock on the condition that WHASI terminate business, liquidate its assets, "clean up its balance sheet" and surrender its Article 28 license. St. Vincent's also required that 100 percent of WHASI shares be transferred. In turn, WHASI stockholders, some of whom were partners of WHA, conditioned the transfer of stock on St. Vincent's guarantee of a $ 276,000 equipment lease between WHASI and WHA. St. Vincent's had entered into an unrelated construction finance agreement prior to agreeing to accept the WHASI stock, and therefore did not have the capital necessary to undertake the medical facility as required by the WTC lease. This, combined with WHASI's potential liabilities, prompted St. Vincent's to decide to sublet the WTC facility to a group of physicians once it obtained the WHASI stock. As a result, in late *83 1981, Affiliated Physicians of St. Vincent's, P.C. (Affiliated Physicians) was formed to operate the WTC facility. Affiliated Physicians was comprised of physicians who were on the medical staff of St. Vincent's. St. Vincent's made two nonrecourse loans totaling $ 140,000 to two of Affiliated Physicians' doctors which were to be repaid solely from any net earnings of Affiliated Physicians. On December 30, 1981, an agreement was entered into whereby WHASI stockholders transferred approximately 90% of the issued and outstanding WHASI stock (including petitioner's 54,250 shares) to St. Vincent's. Pursuant to this agreement, St. Vincent's guaranteed a $ 276,000 equipment lease entered into on this date between WHASI and WHA. The remainder of the WHASI stock was transferred to St. Vincent's in March 1982. St. Vincent's did not have the WHASI stock appraised, and ultimately recorded the stock on its books at a value of zero. On April 23, 1982, St. Vincent's officially changed WHASI's name to World Health Care Management, Inc., retroactive to January 1, 1982. For clarity, we will continue to refer to World Health Care Management, Inc. as WHASI. Representatives of the Port Authority *84 and St. Vincent's had met prior to December 30, 1981, to discuss various changes in the Lease in the event St. Vincent's decided to accept the WHASI stock. On May 5, 1982, St. Vincent's executed a supplemental lease agreement (Supplement No. 4) with the Port Authority, which was dated January 1, 1982. Supplement No. 4 recognized St. Vincent's as the sole owner of all of WHASI's (the Lessee's) stock, but allowed St. Vincent's to make a single transfer of all of the WHASI stock to a not-for-profit corporation of the State of New York. Supplement No. 4 also granted WHASI the right to "make a single subletting of the premises in its entirety to a professional corporation all of the shareholders of which are physicians who are fully licensed, qualified and certified and who are on the staff of St. Vincent's * * *." WHASI obtained the right to cancel the Lease at the end of the first, second and fifth years. The base rental rate, however, was increased under Supplement No. 4 as follows: Base Rent
Term
Annual Base Rent
Per Sq. Ft.
1/1/82 - 12/31/86
$  98,292
$ 10.31
1/1/87 - 12/31/93
320,004
33.55
1/1/94 - 12/31/94
420,000
44.03
1/1/95 -  2/29/96
440,004
46.13
*85 Additionally, WHASI was obligated to pay $ 28,620 over three years ($ 795 per month) for a sprinkler system, and also was required to provide an emergency ambulance service during the WTC's normal business hours. The rent arrearages as set forth in Supplement No. 3 remained unchanged. The Port Authority indicated to St. Vincent's that it would enforce exclusivity for the facility by not renting to another group of physicians at the WTC. Pursuant to Supplement No. 4, WHASI subleased the WTC premises, with the Port Authority's consent, to Affiliated Physicians for the period January 1, 1982, through December 31, 1986. On May 7, 1982, St. Vincent's assigned the WHA equipment lease to Affiliated Physicians, although St. Vincent's remained liable as a guarantor. Valuation Reports
The WHASI stockholders computed their charitable contribution amount based on an accounting statement that was attached to a letter from WHASI's legal counsel to former WHASI shareholders. See Appendix. The statement was prepared using a combination of book, cost and fair market values, as determined by petitioner's valuation report (discussed below). Using this statement, petitioner computed *86 a total value of $ 488,250 ($ 9.00 per share times 54,250 shares) for his shares of WHASI stock. Based on his transfer of WHASI stock, petitioner claimed a charitable deduction of $ 252,439 on his 1981 tax return, and carried forward the $ 235,811 balance to his 1982 return. The Edward S. Gordon Company, Inc. prepared the appraisal report, "Valuation of Leasehold Estate at Five World Trade Center" (Gordon Report), for petitioner. The Gordon Report based its WHASI stock valuation solely on its estimate of the value of WHASI's WTC Lease. Mr. Paul Mucci (Mucci) performed the Lease valuation used in the Gordon Report. Mucci valued the WHASI Lease using 1981 "asking" rents for general office space in Manhattan's Financial District. In 1981, asking rents were slightly higher than actual rents. Based on the market information he obtained, Mucci concluded that at the time of the stock transfer WHASI's space at the WTC would lease for approximately $ 40 per square foot, "assuming typical World Trade Center lease terms." In his valuation, Mucci assumed an initial lease term of 10 years beginning January 1, 1982, and estimated base market rental rates as follows: Period
Base Rent *
1/1/82 - 12/31/84
$ 40.00
1/1/85 - 12/31/87
45.00
1/1/88 - 12/31/91
50.00
*87 Upon expiration of this initial lease term Mucci assumed that a new lease or renewal would be entered into at prevailing market rates and terms for the period January 1, 1992, through February 29, 1996. [3] Certain adjustments [4] were factored into the base rents determined by Mucci to arrive at annual estimated total rent per square foot. From annual estimated market rents Mucci subtracted WHASI's annual rent (plus adjustments, including rent arrearages) using the terms of Supplement No. 3 to arrive at annual cash flow per square foot. He then multiplied cash flow by 9,538, the total square feet of the WHASI lease, to arrive at a projected total annual cash flow. Lastly, Mucci discounted cash flow by 15 percent to arrive at $ 2,105,000, his estimate of the present value of WHASI's Lease at the time of the stock transfer. In valuing WHASI's Lease, Mucci *88 assumed that the Port Authority would not exact a financial penalty for its consent to sublease. Mucci did not attempt to value any other WHASI assets or liabilities. The American Appraisal Associates prepared the valuation report (American Report) for respondent. The American Report determined the fair market value of WHASI stock using the cost method, rather than the market or income methods, because WHASI had become inactive and its value was based on its underlying assets. The cost method adjusts a company's balance sheet to present the total fair market value of its assets and liabilities, the difference reflecting the total fair market value of 100 percent of the stockholder's equity on a majority basis. In addition, the American Report took into account other "valuation considerations" [5] in determining WHASI's value. *89 Mr. Roger Stehm (Stehm) prepared the WHASI Lease valuation used in the American Report. Unlike the Gordon Report which used Supplement No. 3, Stehm used Supplement No. 4 in valuing the Lease on the basis that "The base [rent] was understood to have been renegotiated in the final months of 1981 for various reasons, and the normal willing buyer and seller knowledgeable of all relevant factors would have known about these changes." Stehm's valuation method also differed from Mucci's in that Stehm looked at actual rents for the period 1981 through 1987 rather than asking rents in 1981. Stehm did not find market rates for medical space comparable to the space leased by WHASI. As an alternative, Stehm took the base rent per square foot pursuant to Supplement No. 4 and added "incentives, inducements, or reductions a lessor would offer relative to office space similar in all other respects to WHASI's space." [6] Using this method, Stehm computed rent amounts for equivalent office space as follows: Equivalent
Term
Base Rent* Incentives*
Rent *
1/1/80 - 4/30/81
$  8.34 ** $ 7.24 - 13.34
$ 15.58 - 21.68
5/1/81 - 12/31/81
9.12 ** 7.24 - 13.34
16.36 - 22.46
1/1/82 - 12/31/86
10.31 ***
7.24 - 13.34
17.55 - 23.65
1/1/87 - 12/31/86
33.55 ***
7.24 - 13.34
40.79 - 46.89
1/1/94 - 12/31/94
44.03 ***
7.24 - 13.34
51.27 - 57.33
1/1/95 - 2/29/96
46.13 ***
7.24 - 13.34
53.37 - 59.47
*90 Stehm concluded that the equivalent rents he generated were equal to market rents, resulting in no rental savings on the stock transfer date. Stehm "confirmed" his conclusion by comparing the current (1987) WTC market *91 rate of $ 32 per square foot with the $ 33.55 base rent per square foot (excluding incentives) due under Supplement No. 4. Based on the foregoing, Stehm determined that the Lease had no fair market value as of December 30, 1981. Stehm also prepared an alternative valuation based on the rental differential between Supplement No. 3 and Supplement No. 4. Applying a discount rate of 13 percent, Stehm determined the value of the Lease using Supplement No. 3 to be approximately $ 708,000. After taking into account WHASI's other assets and liabilities, Stehm arrived at a value of $ 767,000 for WHASI's total stockholders' equity. Stehm then discounted this amount for the lack of marketability of WHASI stock, resulting in a final value of $ 460,200, or approximately $ 2.10 per share. However, Stehm recognized that the Lease would have no value if WHASI was not allowed to keep the rent differential it charged a sublessee. In addition to the Lease valuation, the American Report determined the fair market value of WHASI's assets and liabilities as follows: Assets
Improvements to leased property
$ 256,000
Furniture and equipment
96,000
Security deposit [7]
14,000
Intangible assets
10,000
$ 376,000
*92 Liabilities
Rent arrears settlement due
[8] $ 105,900
Port Authority
Sprinkler system payments due
[9] 20,400
Port Authority
Loans due shareholders
[10] -0- Loans due St. Vincent's
[11] -0- Due WHA - furniture
14,070
Due WHA - equipment
[12] 176,500
Total fair market value of
WHASI liabilities, rounded
$ 317,000
Stockholders' equity (before discount)
$  59,000
*93 The American Report then discounted stockholders' equity of $ 59,000 by 40 percent, based on factors such as "WHASI's lack of earnings, lack of dividends, lack of capital, small size, limited prospects, and limited market for its stock." Applying this discount to stockholders' equity resulted in a fair market value of WHASI stock of $ 35,400 [13] (1-.40 X $ 59,000), or approximately 16 cents per share ($ 35,400/219,500 shares). Respondent's notice of deficiency, dated September 2, 1986, disallowed the entire charitable deduction petitioner claimed for the transfer of his WHASI stock to St. Vincent's. Respondent's determination was based on arguments that (1) the transfer of stock was, for various alternative contentions, not tantamount to a gift, and (2) even if the transfer was in fact a gift, the WHASI stock had no value. Promissory Notes
WHASI issued seven promissory notes dated May 4, 1977, to certain WHASI stockholders *94 in the amount of $ 9,091 each, and also issued one note to petitioner in the amount of $ 57,728. The notes did not bear interest, and stated that they were payable on demand. In October 1977, petitioner allegedly purchased one of the notes from a WHASI stockholder, thus giving petitioner two WHASI notes totaling $ 66,819. On December 30, 1981, petitioner and the other WHASI noteholders allegedly assigned their interests in their notes to St. Vincent's. The notes, however, inexplicably had been endorsed over to Manufacturers Hanover Trust Co. prior to the alleged assignment, and as far as the record indicates, they were not entered as assets on St. Vincent's books. As a consequence of the alleged assignment, petitioner claimed a charitable contribution for $ 66,819, the full face amount of the two notes. Respondent disallowed petitioner's charitable contribution deduction for the notes, claiming that (1) petitioner had not established the existence of such debt, nor had he established the fair market value of the notes, and (2) alternatively, the amount paid by petitioner to WHASI for the notes constituted contributions to capital. ULTIMATE FINDINGS OF FACT (1) In 1981 petitioner *95 made a valid gift of WHASI stock to St. Vincent's. (2) On the date of contribution, the WHASI stock had a value of 59" per share. (3) The funds received by WHASI represented by the notes were contributions to capital, and the notes have no value separate from the value of the stock. OPINION Charitable Contribution of the WHASI Stock
Section 170 permits a deduction for contributions to qualifying charitable organizations that are paid within the taxable year. The term "charitable contribution" is defined as a contribution or gift to or for the use of an organization described in section 170(c). Sec. 170(c). The parties agree that St. Vincent's is such an organization. However, based on three alternative arguments, respondent contends that petitioner is not allowed a deduction under section 170. The following is a summary of each of respondent's arguments and our reasons for rejecting them. First, based on a "step transaction" analysis, respondent argues that in substance petitioner contributed WHASI stock not to St. Vincent's, but rather to Affiliated Physicians, which is *96 not a tax-exempt organization. In determining the tax consequences that flow from a given transaction, we must look to the transaction's substance as opposed to its form. Gregory v. Helvering,293 U.S. 465 (1935). We find ample evidence establishing that in both substance and form St. Vincent's was the donee of the WHASI stock. In offering their stock to St. Vincent's, WHASI shareholders did not impose any restrictions on St. Vincent's subsequent use of the stock. While New York Public Health Laws and provisions in the Lease affected the use of one of WHASI's assets (the Lease), they did not preclude St. Vincent's from accepting the WHASI stock. Furthermore, by accepting the stock St. Vincent's obligated itself to potential liabilities, which we doubt they would have accepted merely to facilitate Affiliated Physicians. Receipt of the stock also afforded St. Vincent's the opportunity to "fly their flag" in the Financial District with the hope of bringing additional patients to St. Vincent's Hospital. Joseph Hoffman [14] viewed WHASI as a "St. Vincent's Hospital operation. *97 " Furthermore, according to Dr. Joseph English, [15] St. Vincent's always wanted to stay involved and have an interest at the WTC, but its financial condition precluded it from investing more money in the project. Based on the foregoing, we find that the WHASI stockholders donated their stock to St. Vincent's, not Affiliated Physicians. Second, respondent contends that petitioner is not entitled to a charitable deduction in 1981 because the contribution of WHASI stock was not completed until March 1982. A cash basis taxpayer's charitable contribution is deductible under section 170 in the year the contribution is actually paid. Sec. 1.170A-1(a), Income Tax Regs. Generally, a contribution of property is made at the time delivery is effected. Sec. 1.170A-1(b), Income Tax Regs.; Guest v. Commissioner,77 T.C. 9, 18 (1981). *98 On December 30, 1981, approximately 90 percent of the WHASI stock, including petitioner's, was transferred to St. Vincent's; the remaining stock was not transferred until March 1982. Respondent contends that since St. Vincent's originally had conditioned their acceptance on receipt of 100 percent of the WHASI stock, petitioner's delivery in 1981 was ineffective. Given this condition, however, we conclude that St. Vincent's would not have accepted the WHASI stock offered on December 30, 1981, if it had not been satisfied through oral pledges, or in some other manner, that it would receive the remaining shares of WHASI stock. As a result, we find that petitioner's contribution of WHASI stock occurred on December 30, 1981, even though less than 100 percent of the shares were formally transferred on that date. Lastly, respondent argues that petitioner received significant "economic benefits" as a result of the transfer of stock, thereby precluding a charitable contribution. The term "charitable contribution," as used in section 170, is synonymous with the word "gift." DeJong v. Commissioner,36 T.C. 896 (1961), *99 affd. 309 F.2d 373 (9th Cir. 1962). "A gift is generally defined as a voluntary transfer of property by the owner to another without consideration therefor. If a payment proceeds primarily from the incentive of anticipated benefit to the payor beyond the satisfaction which flows from the performance of a generous act, it is not a gift." DeJong v. Commissioner,36 T.C. at 899. This is a factual issue. Rusoff v. Commissioner,65 T.C. 459, 469 (1975), affd. in an unreported opinion (2d Cir. 1977, 77-1 USTC par. 9338, 39 AFTR2d 77-1108). Respondent cites two economic benefits that accrued to petitioner as a result of the transfer of stock to St. Vincent's: (1) WHASI rent arrearages were assumed by St. Vincent's; and (2) the equipment lease entered into between WHASI and WHA on the closing date was guaranteed by St. Vincent's. We find that neither of these "benefits" defeat the donative intent attached to petitioner's gift of stock to St. Vincent's. The rent arrearages were simply one of the existing WHASI obligations that St. Vincent's assumed when they accepted the WHASI stock. We have factored this liability into *100 our valuation of the WHASI stock. With respect to St. Vincent's assumption of the equipment lease, we conclude that this equipment had value, especially when considering the lack of capital available to purchase such equipment. Respondent's expert's report also determined that the equipment had some value (although less than the equipment lease amount). Valuation of WHASI stock as of December 30, 1981
Having found that petitioner made a valid charitable contribution of his WHASI stock in 1981 to a qualified donee, we must determine the amount of the contribution. When a taxpayer contributes property other than money, the amount of the contribution is the fair market value of the property on the date of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. "Fair market value" is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. *101 ; United States v. Cartwright,411 U.S. 546, 551 (1973). Fair market value of property on a given date is a question of fact to be determined on the basis of all relevant evidence. Skripak v. Commissioner,84 T.C. 285, 320 (1985); Estate of Andrews v. Commissioner,79 T.C. 938, 940 (1982); Kaplan v. Commissioner,43 T.C. 663, 665 (1965). The burden is on the taxpayer to prove that the value determined by respondent is incorrect. Rule 142(a). At the outset, we note that there are inherent difficulties in determining "fair market value" in the context of litigation. As this Court has observed: Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations -- a process clearly more conducive to the proper disposition of disputes such as this. The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like *102 pronouncement. * * * [Messing v. Commissioner,48 T.C. 502, 512 (1967).] With this in mind, we consider all the evidence presented, giving appropriate weight to the expert witnesses presented by both parties. See Silverman v. Commissioner,538 F.2d 927, 928 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. While we found flaws in both expert reports, we are particularly concerned with flaws underlying petitioner's expert's Lease valuation. For example, it is well-established that the fair market value of property should reflect the highest and best use of the property as of the valuation date. Symington v. Commissioner,87 T.C. 892, 896 (1986). In determining the highest and best use of the property we must consider any restrictions that limit the use of the property. C. G. Sloan and Co. v. Commissioner,38 T.C. 203, 209 (1962). WHASI's Lease required that the premises be used for a medical facility, and prohibited the use of the premises for general office space. Accordingly, the highest and best *103 use, in fact the only use, of the Lease was for the operation of a medical facility. Petitioner's expert, however, predicated the base market rents used in his Lease valuation on asking rents for general office space rather than on comparable rents for medical facility space. This is significant because the WTC charged WHASI less rent for the medical facility space than it charged other tenants renting general office space. As a result, petitioner's Lease valuation based on rent charged for general office space rather than medical facility space produces an inflated value for the Lease. Additionally, petitioner's expert's use of asking rents, which were higher than actual rents, also contributed to an inflated Lease value. Respondent employed the cost method in valuing the WHASI stock, which included a valuation of WHASI's Lease and WHASI's other assets and liabilities. While a valuation of all of WHASI's assets and liabilities using the cost method is certainly relevant, we need not restrict our consideration to only one valuation approach. Estate of Andrews v. Commissioner, supra at 945. *104 Rather, we consider all factors relevant to a willing buyer and a willing seller. One such factor is WHASI's past earnings as a medical facility, particularly since the Lease upon which petitioner places primary emphasis could be used only for a medical facility. We find it significant that WHASI operated at a loss throughout its existence despite being located in a prime market and being guided by an individual with the business acumen of petitioner, Norton Mailman. Unable to pay its rent, WHASI resorted to subletting space for the practice of certain types of medicine not originally contemplated by the Port Authority. The donee's use (or non-use) of the property may also be a relevant factor in determining the property's value. Chiu v. Commissioner,84 T.C. 722, 736 (1985); Skripak v. Commissioner, supra at 322. It is evident that, for various reasons, St. Vincent's always intended to sublet the Lease premises. But under the terms of either Supplement No. 3 or No. 4, the Lessee was required to remit to the Port Authority any excess rent the Lessee *105 charged a Sublessee, thereby precluding St. Vincent's from ever being able to profit from their intended sublease. In the final analysis, and using either the terms of Supplement No. 3 or No. 4, we conclude that the lease resulted in no rent advantage to St. Vincent's. Although petitioner failed to prove that the rent under the Lease was less than fair market rent, we find that the Lease itself had some intrinsic value. Even though St. Vincent's sublet the space, the Lease still afforded St. Vincent's an opportunity to establish their presence, in some capacity, in the potentially lucrative Financial District area. It was hoped that this presence would translate into increased patients, and ultimately increased revenue to St. Vincent's Hospital. For this attribute, we value the Lease at $ 50,000. Petitioner included only WHASI's Lease in his stock valuation, while respondent included the Lease and WHASI's other assets and liabilities. Petitioner did not establish a value for any of WHASI's other assets greater than that determined by respondent, and thus we accept respondent's valuations. Certain WHASI liabilities also existed at the time of the stock transfer. We accept *106 the values respondent assigned to WHASI's liabilities to the Port Authority, WHA, [16] St. Vincent's [17] and WHASI stockholders. We decline to include the sprinkler system liability, as this was included in Supplement No. 4 of the Lease which, although negotiated to some extent prior to the donation, was entered into solely between the Port Authority and St. Vincent's and was executed well after the donation. In sum, we find that on the date the WHASI stock was transferred to St. Vincent's, WHASI had the following assets and liabilities valued as follows: FAIR MARKET VALUE OF WHASI ASSETS, LIABILITIES
AND STOCKHOLDERS' EQUITY AS OF DECEMBER 30, 1981
Assets
Lease
$  50,000
Lease improvements
256,000
Furniture and equipment
96,000
Security deposit
14,000
Intangible assets
10,000
Total assets
$ 426,000 Liabilities
Rent arrears settlement
$ 105,900
due Port Authority
Due WHA-equipment
176,500
Due WHA-furniture
14,070
Loan due St. Vincent's
-0-
Loans due stockholders
[18] -0-
Total liabilities
($ 296,470)
Stockholders' Equity
Stockholders' Equity
$ 129,530 *107 We find that this amount reflects the fair market value of 100 percent of the WHASI stock contributed to St. Vincent's, and therefore decline to apply a discount factor. See Estate of O'Connell v. Commissioner,640 F.2d 249, 253-254 (9th Cir. 1981), affg. in part a Memorandum Opinion of this Court. As a result, we find the fair market value of WHASI stock to be 59" per share ($ 129,530/219,500 shares). Petitioner is entitled to a charitable contribution of $ 32,008 (59" X 54,250 shares) for his donation of WHASI stock to St. Vincent's. Promissory Notes
Petitioner claimed a charitable contribution for the face amount of WHASI notes he allegedly donated to St. Vincent's. Petitioner did not offer any testimony establishing that the fair market value of the WHASI notes was equal to their face amount. Instead, petitioner opted to "rely on the balance sheet of the corporation and make our argument on brief to the extent possible." Respondent attacks both the existence and purported value of the notes. Petitioner bears the burden *108 of disproving respondent's determination. Rule 142(a). For the purposes of the following discussion we are willing to assume that petitioner donated the notes to St. Vincent's. Nevertheless, we are convinced that these notes had no value at the time they were transferred. At first blush it may seem paradoxical to conclude that, while the common stock had some value, the notes had no value. That paradox, however, is explained by petitioner's failure to convince us that the notes constituted bona fide indebtedness of WHASI. During the time that the notes were issued WHASI was commencing operations and apparently was in need of funds to meet its day-to-day operations. While it is unclear whether all stockholders advanced funds, it does appear that the amount of the advances represented by the notes were roughly proportionate to most of the stockholders' equity in WHASI. In addition, the notes carried no interest. In these circumstances, it appears to us that the advances represented by the notes should properly be characterized as contributions to capital. See In re N & D Properties, Inc.,799 F.2d 726 (11th Cir. 1986); Matter of Multiponics, Inc.,622 F.2d 709 (5th Cir. 1980); *109 12B W. Fletcher, Cyclopedia of the Law of Private Corporations, sec. 5739 (rev. perm. ed. 1984). Petitioner contends that, even if the advances are properly characterized as capital contributions, the value should be reflected in an increase to the value of his shareholdings. Essentially we have used the fair market value of the underlying assets, less liabilities, in arriving at the value of the stock. To add to that value the face value of notes would produce an illusory stock value. [19]
Decision will be entered under Rule 155.
APPENDIX WORLD HEALTH ADMINISTRATIVE SERVICES, INC.
STATEMENT OF ASSETS, LIABILITIES AND
STOCKHOLDERS' EQUITY AT FAIR MARKET VALUE
DECEMBER 30, 1981
Assets:
Cash
$    0      Accounts Receivable
0      Total Current Assets
$     0     Fixed Assets:
Lease at Five World
Trade Center
$ 2,105,000
Leasehold Improvements-
Cost
78,747
Less: Accumulated
Amortization
45,014
$ 2,228,761
Other Assets:
Lease Security Deposit
$     22,034
Total Other Assets
22,034
Total Assets
$ 2,250,795
*110 LIABILITIES AND STOCKHOLDERS' EQUITY
Rent Arrears
Settlement
$ 36,789
Accounts Payable
0
Total Current
Liabilities
$ 36,789
Other Liabilities:
Due to St. Vincent's
$  24,266
Due to World Health
Associates
14,070
Due to Shareholders
121,365
Rent Arrears
Shareholders
$ 111,619
Less: Current
Portion
36,789
74,830
234,531
Total Liabilities
$ 271,320
Stockholders' Equity at Fair Market
Value 12/30/81 (219,500 Outstanding
Shares at $ 9.00 Per Share)
$ 1,979,475
Footnotes
1. All subsequent statutory references are to the Internal Revenue Code of 1954, as amended, and as in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise provided.↩
2. Rental arrearages of $ 3,065.75 per month were to be paid by the Lessee beginning January 1, 1980 and continuing through December 31, 1985.↩
*. Per square foot↩
3. The original Lease and Supplement No. 4 have expiration dates of February 29, 1996. Supplement No. 3, however, reflects a lease term beyond May 1, 1996. ↩
4. Adjustments included: (1) electrical charge, (2) wage rate escalation, (3) cleaning charge and (4) real estate tax and PILOT escalation.↩
5. "Valuation considerations" included: 1) The nature of the business and the history of the enterprise from its inception, 2) The economic outlook in general, and the condition and outlook of the specific industry in particular, 3) The book value of the stock and the financial condition of the business, 4) The earning capacity of the company, 5) The dividend-paying capacity, 6) Whether or not the enterprise has goodwill or other intangible value, 7) Sales of the stock and the size of the block of stock to be valued, and 8) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.↩
6. Stehm estimated "incentives" as follows: 1. $ 4.19 to $ 5.24 per square foot for the emergency ambulance service. This service reduces the risk of negligence/liability lawsuits. The cost of the salaries, equipment, maintenance, and depreciation could easily cost $ 40,000 to $ 50,000 per year and justify an incentive of $ 4.19 to $ 5.24 per square foot. 2. $ 1.00 to $ 3.00 per square foot to construct the considerable specialized improvements to leased property required to satisfy the needs of a medical facility. 3. $ 1.00 to $ 3.00 per square foot to have the strong marketing appeal of an indigenous medical/emergency service in attracting other tenants. 4. $ 1.05 to $ 2.10 per square foot for the reduction in the World Trade Center's insurance premium. A reduction of only $ 10,000 to $ 20,000 per year equates to $ 1.05 to $ 2.10 per square foot of the subject office space. * Per square foot ** Per Supplement No. 3 *** Per Supplement No. 4↩
7. In lieu of a cash security deposit, WHASI delivered to the Port Authority a U.S. Treasury 8.5 percent bond due in 1999 with a face value of $ 21,000.↩
8. Based on monthly payments of $ 3,065.75 for 48 months, discounted at 18 percent. ↩
9. Based on monthly payments of $ 795 for 36 months, discounted at 18 percent. This obligation arose under Supplement No. 4. ↩
10. Citing WHASI's poor financial condition and the fact that the shareholder loans were the last to be paid, the American Report determined that this liability had a zero value. ↩
11. St. Vincent's paid WHASI's WTC rent, totalling $ 24,266, during the two months prior to the stock transfer. It appears that this amount was credited against the amount due WHA for the equipment lease. In any event, respondent's expert concluded that this liability would never be paid, and thus assigned it no value. ↩
12. Based on monthly payments of $ 4,600 per month for 60 months, discounted at 20 percent.↩
13. The American Report originally contained an alternate valuation of $ 34,800. Due to revisions entered by respondent at trial, the alternative valuation was changed to $ 35,400. The approximate per share valuation, however, remained unchanged.↩
14. Joseph Hoffman was the Executive Vice-President and Chief Operating Officer of St. Vincent's. ↩
15. Dr. Joseph English was a physician at St. Vincent's and Director of Affiliated Physicians.↩
16. The WHA liabilities consist of a $ 14,070 existing liability and an equipment lease liability, entered into between WHASI and WHA on the closing date, which was guaranteed by St. Vincent's. ↩
17. There is nothing to indicate that this liability would ever be repaid. Furthermore, it appears that this liability was credited against the amount due WHA under the equipment lease.↩
18. See discussion, infra.↩
19. This result is consistent with the manner that St. Vincent's recorded the gift on its books. The stock was reflected but the notes were not.↩