ANTHONY I. PROVITOLA and KATHLEEN A. PROVITOLA, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Provitola v. Commissioner
Docket No. 14520-88
United States Tax Court
T.C. Memo 1990-523; 1990 Tax Ct. Memo LEXIS 576; 60 T.C.M. (CCH) 939; T.C.M. (RIA) 90523; October 2, 1990, Filed *576 Decision will be entered under Rule 155. Anthony I. Provitola and Larry Marsh, for the petitioners. Kirk S. Chaberski, for the respondent. WELLS, Judge. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax Under Sections
Year
Deficiency
6653(a)(1) [1]
6653(a)(2)
6659
1983
$ 52,933.22
$ 2,646.66
*
$ 15,879.97
1984
$ 29,401.51
$ 1,470.80
*
$  8,820.45
*578 Respondent also determined that interest on the underpayments should be calculated using the increased rate of interest provided by section 6621(c). After concessions, the issues to be decided are: (1) whether petitioners are entitled to any deductions for certain charitable contributions during the years in issue; (2) whether petitioners are liable for the additions to tax for negligence; (3) whether petitioners are liable for the additions to tax for valuation overstatement; and (4) whether the increased rate of interest for tax motivated transactions applies to petitioners' underpayments, if any, for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. Petitioners [2] resided in DeLand, Florida, when the petition in the instant case was filed. Petitioner has been a practicing Florida *579 attorney since 1966, specializing in personal injury cases. He became interested in computers and computer programming while working for the Navy during 1963, and, after becoming a lawyer, frequently considered how computers might be used in his office. In 1979, he began acquiring Radio Shack TRS-80 Model I microcomputers to assist in the administration of his growing law practice. In early 1981, he acquired the means to link the computers together in a network, improving the performance of his system. Petitioner conceived the idea of developing computer software, which he later named the "Law Firm Management System" (LFMS software), to use the capabilities of his computers to automate a wide variety of tasks in his office. In June 1981, he hired his daughter, Coleen Provitola, who had just graduated from high school, to begin designing the system and writing the programming code, using "BASIC" computer language, which she had learned in school. Coleen Provitola received between $ 10,000 and $ 12,000 per year for her services, the money being paid out of petitioner's law practice. During summer 1981, petitioner also spent substantial time working on the LFMS software. By the *580 end of summer 1981, the LFMS software contained all the functions to be performed. After the initial development phase, Coleen Provitola entered Duke University as a full-time student. She, however, continued to assist petitioner with the LFMS software, consulting with him by telephone, and working over vacations and during periodic weekend trips home during the school year. In September 1981, petitioner organized Lawyers Computer Corporation (LCC) to hold the LFMS software. [3]
Petitioner and Coleen Provitola completed the development of the LFMS software in August 1983, 26 months after beginning it. As the LFMS software was used in his office, petitioner would "show off" its capabilities to attorneys *581 visiting him, but their reactions to it, while favorable, were "noncommittal." Petitioner did not make any other efforts to market or promote the LFMS software at that time. Petitioner then approached John B. Stetson University [4] (Stetson), where he had obtained his law degree, to determine if it would accept a donation of his shares of stock in LCC. Various officials of Stetson inspected the LFMS software and were impressed favorably. Stetson was interested in marketing the LFMS software for the purpose of generating income for itself, and petitioner believed that transferring the LFMS software to Stetson would improve its chances for commercial success. Petitioner offered to transfer all the outstanding shares of stock in LCC to Stetson in 1983, but Stetson was willing to accept only 40 percent of such shares pending a review of the LFMS software by Mr. Robert J. Stinnett, an attorney who was familiar with computer systems used in lawyers' offices. Petitioner accordingly transferred 400 shares of stock in LCC, representing 40 percent of the outstanding shares, to Stetson on December 28, 1983. On December 27, 1983, petitioner, on behalf of LCC, applied for a copyright for the *582 LFMS software. At all relevant times, the LFMS software and the copyright were the sole assets of LCC. In March of 1984, Mr. Stinnett inspected the LFMS software at petitioner's office. Mr. Stinnett prepared a report in which he stated that software of the type developed by petitioner had commercial potential, but that the LFMS software would require substantial work before it would be marketable. On May 10, 1984, Stetson subsequently accepted the remaining 60 percent of the outstanding shares of stock in LCC. Petitioner then resigned all offices he held in LCC and Stetson designated successor officers. Stetson only received a paper copy of the LFMS software code, and not an executable program in machine-readable format, making it difficult for Stetson to perform any work on the LFMS software. Since that time, Stetson has neither used the LFMS software nor attempted to prepare the LFMS software *583 for sale or to market the system, although it did develop a marketing plan after obtaining control of LCC. Stetson and petitioner had an informal understanding that petitioner would assist Stetson with the development and marketing of the LFMS software, but they made no agreement restricting petitioner's ability to develop and market competing computer programs. The LFMS software performed certain of its accounting functions using software proprietary to Radio Shack. Neither petitioner nor Stetson attempted to secure the rights to use such Radio Shack software in conjunction with the LFMS software. Petitioner used the LFMS software in his office after transferring control of the copyright to Stetson, and Stetson was aware of such use. Petitioner replaced the Radio Shack equipment in his office with IBM-compatible microcomputers and, in summer 1984, petitioner converted the LFMS software to run on such microcomputers. Subsequent to the conversion, petitioner and Coleen Provitola did no more work on the LFMS software that had been designed to run on Radio Shack computers. During 1985 and 1986, petitioner and Coleen Provitola developed a new system, called "Lawyer Work," testing *584 the market for it by placing a 20,000-word advertisement in the Florida Bar Journal. That effort, however, did not produce the desired response, and petitioner considered the effort to be a failure. Petitioners claimed charitable contribution deductions on their 1983 and 1984 income tax returns for the respective donations of the shares of stock in LCC to Stetson. On their 1983 return, petitioners reported that the value of the 40-percent interest in LCC donated to Stetson was $ 260,000. [5] The value claimed for the 1983 donation to Stetson was based on a two-paragraph letter, dated April 13, 1984, prepared by petitioner for his accountant, David Miller. In that letter petitioner stated that the total value of LCC was $ 650,000. The $ 260,000 value claimed for the 1983 donation was 40 percent of that amount. Petitioner valued LCC based upon his value of the LFMS software, which he in turn valued by estimating the cost of developing such a system. He estimated that an attorney devoting one-half of the attorney's available time and a programmer working full time would take three years to develop the LFMS software, and that the services of the attorney and programmer would cost *585 $ 450,000 and $ 225,000, respectively. Petitioner estimated the cost of the attorney's time solely on the basis of his own income. This letter was filed with petitioners' 1983 return and comprised the only evidence of the contribution's value. Before providing the April 13, 1984, letter to Mr. Miller, petitioner prepared a memorandum discussing the value of the LFMS software. In that memorandum, petitioner stated that, although the LFMS software was a unique product in the computer software market, "the value [of the LFMS software] is not determined by work expended in its development, but by the potential market for s[u]ch a software system." The memorandum also speculated briefly about the sales potential of the LFMS software and suggested that each copy should sell for $ 20,000. Petitioner did *586 not consult an independent appraiser regarding the value of the LFMS software or LCC. On their 1984 Federal income tax return, petitioners reported a value of $ 390,000 for the donation to Stetson of the remaining 60 percent of the shares of stock in LCC. [6] Neither the 1984 return nor any of the documents attached to it, however, provided any information supporting the value claimed. In his notice of deficiency, respondent disallowed in their entirety the deductions claimed by petitioners on their 1983 and 1984 returns for the donations of the shares of stock in LCC to Stetson. Respondent determined in his notice of deficiency that petitioners had failed to show that the shares of stock in LCC had any value on the dates of the respective donations. The deficiencies determined by respondent for the years *587 in issue were attributable entirely to the charitable contribution deductions claimed by petitioners for the shares of stock in LCC donated to Stetson in 1983 and 1984. OPINION Charitable Contribution Deduction
The first issue to be decided is the amount of the deductions allowable under section 170 for petitioner's respective charitable contributions to Stetson for the years in issue. Respondent determined that petitioners had not established that the contributions had any value on the respective dates the shares of stock in LCC were donated to Stetson. Petitioners bear the burden of establishing the value of the property contributed to Stetson. Parker v. Commissioner, 86 T.C. 547, 562 (1986); Rule 142(a). Although the contributions took the form of shares of stock in LCC, [7] we find that the amount of the allowable deduction turns on the value of the LFMS software at the time the donations were made to Stetson. The valuation of stock in a closely held corporation is a question of fact, Estate of Jephson v. Commissioner, 87 T.C. 297, 303 (1986), and all factors bearing on value are considered, although the weight to be given to each *588 factor is decided by the facts of a particular case. Estate of Andrews v. Commissioner, 79 T.C. 938, 940-941 (1982). Because the copyright for the LFMS software and a paper copy of the programming code were the sole assets of LCC at the time of the donations and because the record reveals no other facts which are relevant to the value of the shares of stock in LCC, we will focus on the valuation of the LFMS software.[8]
*589 Section 1.170A-1(c)(1), Income Tax Regs., provides, with exceptions not relevant here, that the amount of a contribution made in the form of property other than money is the fair market value of such property on the date of the contribution. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. Valuation issues are questions of fact, and all relevant evidence is to be considered in their resolution. Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Cupler v. Commissioner, 64 T.C. 946 (1975); Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). As is customary in valuation cases, both parties have relied heavily on expert opinion to support their contentions as to the value of the contributions. We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value. Parker v. Commissioner, 86 T.C. at 561; *590 Johnson v. Commissioner, 85 T.C. 469, 477 (1985). We are not bound, however, by the opinion of any expert witness when that opinion is contrary to our judgment, especially where the expert's opinion of value is so exaggerated that the opinion is incredible. Parker v. Commissioner, 86 T.C. at 561. While we may accept the opinion of an expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. Parker v. Commissioner, 86 T.C. at 562. Consequently, we will take into account expert opinion testimony to the extent it aids us in arriving at the fair market value of the donated property. Petitioners contend that the value of the LFMS software at the time of the donations to Stetson was equal to $ 650,000, while respondent contends that the LFMS software had no market value at the relevant times. The disparity between the parties' positions results from their differing approaches to determining the hypothetical fair market value of the LFMS software. Petitioners contend that the LFMS software is to be valued on the basis *591 of the cost of reproducing [9] the LFMS software, while respondent argues that the fair market value of the LFMS software is best established from estimates of the potential income it will generate. There is a substantial body of case law which informs our analysis of the parties' contentions. We note at the outset that we have held that replacement or development cost may be considered in valuing property. Cupler v. Commissioner, 64 T.C. at 955. Reproduction cost is an appropriate measure of value, however, only where the taxpayer establishes a probative correlation between such cost and the fair market value of the property. Estate of Palmer v. Commissioner, 839 F.2d 420, 424 (8th Cir. 1988), revg. and remanding on another issue 86 T.C. 66 (1986). [10]
*592 Generally, a correlation between cost and fair market value has been proved where property is unusual in nature and other methods of valuation, such as comparable sales or income capitalization, are not applicable due to the property's uniqueness and nonincome-producing use. See, e.g., Estate of Palmer v. Commissioner, 839 F.2d at 424 (reproduction cost, less depreciation, to be considered in valuing Victorian mansion donated to college where property was unique, had historical significance, and served as hub of college activities); First Wisconsin Bankshares Corp. v. United States, 369 F. Supp. 1034 (E.D. Wis. 1973) (bank building donated to city valued at reproduction cost, less depreciation, because it was "special purpose" property and capitalization of income method was inapplicable, as property was not to be used for production of income); Adams v. Commissioner, T.C. Memo. 1985-268 (value of Norden bombsight prototype donated to museum determined under replacement cost method due to its uniqueness and historical significance). We note that appraisers also limit reliance on the reproduction cost method to cases where the unusual *593 character and use of property render other valuation methods inapplicable. H. Babcock, Appraisal Principles and Procedures 113-121 (1980). Petitioners contend that the uniqueness of the LFMS software justifies valuing it by the reproduction cost method. Uniqueness alone, however, is not sufficient to warrant valuation by reproduction cost. While the unusual nature of property may preclude valuation on the basis of sales of comparable property, it does not render inapplicable the income method, which estimates value by other means. The appropriate valuation method, furthermore, is not determined solely by the character of the property. The use to which property is to be put is also relevant to the question of value. 885 Investment Co. v. Commissioner, 95 T.C. (1990); Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986) (fair market value reflects highest and best use of the property). See also Estate of Palmer v. Commissioner, 839 F.2d at 423 (citing Guggenheim v. Rasquin, 312 U.S. 254, 257 (1941)); Tuttle v. United States, 436 F.2d 69, 72 (2d Cir. 1970); Cupler v. Commissioner, 64 T.C. at 955 *594 (use of property by donee is a factor to be considered in valuing property). Petitioners have cited two cases in support of their contention that the LFMS software should be valued by using reproduction cost, i.e., Driggs v. Commissioner, 87 T.C. 759 (1986), and In re Unimet Corp., 74 Bankr. 156 (Bankr. N.D. Ohio 1987). We have examined those cases and find them inapposite. In Driggs, we valued a license to market computer software in order to determine whether nonrecourse notes issued in payment for it would be taken into account for purposes of determining the deductions allowed under section 1253 with respect to the license. Under the facts of that case, we found that the value of the licenses under the "willing-buyer willing-seller" standard was to be determined by the marketability of the software, instead of its reproduction cost. Thus, rather than supporting petitioners, the analysis in Driggs supports respondent. Unimet, a bankruptcy case, dealt with the valuation of computer programming codes which a corporation could reuse without modification in software systems developed for particular customers. The court held, under *595 the facts of that case, that reproduction cost was a reliable indicator of value. The use of the computer code valued in Unimet, however, is quite different from the use contemplated in the instant case, inasmuch as the LFMS software was to be held for sale, while the programming code in Unimet was not. We consequently derive little guidance from Unimet. We find that the LFMS software is not unusual and intended for noncommercial use. Accordingly, we hold that reproduction cost is not an acceptable indicator of the value of the LFMS software. Rather, we find that the LFMS software is income producing property and hold that the principal determinant of its value is the amount of profit which the LFMS software could be expected to produce. We base our conclusions on several considerations. First, petitioner stated that his purpose in transferring LCC to Stetson was to enable Stetson to reap the profits of marketing the LFMS software. Furthermore, at trial, H. Graves Edmonson, Stetson's Vice President for Finance, testified that one of the principal reasons Stetson was interested in the LFMS software was the prospect of deriving revenue from the sale of the LFMS software. *596 Second, petitioner himself, in a memorandum to his accountant, discussed the value of the LFMS software for purposes of the deduction to be claimed for the 1983 donation. There, he expressly acknowledged that the potential market for the LFMS software, rather than its development cost, was of controlling importance in setting its value. The expert testimony offered by petitioners did not establish the requisite correlation between the value of the LFMS software and its cost. While petitioners' experts asserted that their estimates of development cost reflected the fair market value of the LFMS software, such general statements of experts alone are not determinative of value. Cupler v. Commissioner, 64 T.C. 946, 958 (1975). Neither of petitioners' experts gave any credible reasons for finding that the development cost method was superior to other possible valuation methods. Petitioners' first expert, Mr. Sylvan Wells, had no training or experience in property appraisal and previously never had made a software evaluation of the type he prepared for the instant case, although he was an attorney who had created and marketed computer software for law offices. The *597 only reason given in his report for the appropriateness of the development cost method was that it contained the fewest variables of any cost estimation method, and that it therefore afforded the least difficult means of making an estimate. We find such reasoning hardly a compelling ground for preferring the development cost approach over the others available. Moreover, Mr. Wells stated that the purpose of developing a system such as the LFMS software would be to exploit it commercially. Mr. Wells also testified that development of such a system normally would be undertaken only after a study of the market suggested that the effort would be worthwhile financially. Petitioners' second expert, Dr. Newman-Wolfe, an Assistant Professor in the Computer Science Department of the University of Florida, was not a professional appraiser. Although he previously had valued software under the development cost approach, he was familiar with no other valuation method. Furthermore, his experience with the development cost method was limited to its use as a technique for assisting managers to determine the cost of developing software for budget and staff allocation purposes, and not as a means *598 of approximating the fair market value of the programs developed. Dr. Newman-Wolfe stated that in valuing software a potential purchaser would take into account its marketability. Development cost, in Dr. Newman-Wolfe's view, would become a consideration only after a potential purchaser had determined that sufficient demand for the product existed to justify bringing it to market, and such cost would primarily affect the potential purchaser's decision as to whether to acquire the system or to develop a similar system independently. Respondent's expert, Mr. Donald McEwen, although not an officially accredited property appraiser, has valued computer hardware and software on numerous occasions for both the Federal Government and private clients. Mr. McEwen considered three potential methods of valuing the LFMS software, i.e., replacement cost, market or comparable sales, and capitalization or income. He concluded that the "highest and best use" of the LFMS software was to generate a stream of net income, and that the best indicator of its value was the expected size of the income stream. He further concluded that the development cost of the LFMS software could not reflect accurately *599 the projected net income from the sales of the LFMS software or its value. Mr. McEwen's objections to the use of the development cost method of valuing income-producing property are repeated in treatises dealing with appraisal techniques. See, e.g., G. Smith and R. Parr, Valuation of Intellectual Property and Intangible Assets 223, 233-244 (1989). [11] We found Mr. McEwen's analysis of the applicability of the replacement cost method to the LFMS software to be persuasive, and neither the testimony of petitioners' experts nor any other evidence in the record convinces us that any correlation existed between the cost of developing the LFMS software and its fair market value at the time of petitioner's contributions to Stetson. *600 We next consider the LFMS software's potential for producing income. Petitioners introduced no reliable evidence concerning the LFMS software's expected sales or income. Neither petitioner nor his experts conducted any investigation or survey to determine the potential market for the LFMS software, including the number of copies which could be sold and the price at which it could be sold. In the memorandum written for his accountant, petitioner did make some statements concerning prospective sales of the LFMS software and the revenue to be generated therefrom, but nothing indicates that such estimates were anything other than speculation or wishful thinking. Mr. McEwen, respondent's expert, reviewed such projections and found them "far from realistic." One of petitioners' expert witnesses, Mr. Wells, did devote one paragraph of his report to an estimate of revenues to be generated by potential sales, but he stated in the report that his figures concerning the revenue to be generated from sales of the LFMS software were "conjecture." Furthermore, on cross-examination, he admitted the projection was a "guesstimate" which he had not spent a lot of time developing. Indeed, it *601 appears that his "market survey" was limited to comparing the LFMS software to a software system which his office had purchased around 1983. He and petitioner never discussed the price at which the LFMS software could be sold or the number of copies which might be sold. Both of petitioners' experts stated that they could not produce reliable estimates of value based on potential sales due to the many variables involved. The inability to determine value under the income or capitalization method, when it is otherwise applicable, does not necessarily mean that use of such valuation method is inappropriate; rather, it simply indicates that the property's value is speculative. H. Babcock, Appraisal Principles and Procedures 77 (1980). Even though the application of the reproduction cost method might result in a figure that purports to represent the property's worth, such a result alone does not make the reproduction cost method an acceptable measure of that property's value. In other words, a valuation method otherwise inappropriate to an inquiry into fair market value does not become a probative indicator of value simply because its application produces a number greater than zero. *602 Similarly, respondent's expert, Mr. McEwen, concluded that he could not determine value based on potential sales of the LFMS software. At trial, he testified that market value depended on the product itself, competitive products, and demand in the marketplace for new products. He concluded that the LFMS software could not be marketed as it existed at the time of the donations. Certain features of the LFMS software had to be changed to make it suitable for operation in offices other than petitioner's. That view was shared by others; Mr. Stinnett, who reviewed the LFMS software for Stetson in 1984, found that a "not inconsiderable investment" would be required to put the LFMS software in marketable condition. The way the computer code was written, however, rendered it burdensome to make the necessary changes and to maintain the LFMS software. Indeed, petitioners' own expert, Mr. Wells, testified that the programming code for the LFMS software was very difficult to read and that a programmer, other than the author, would have trouble making the necessary changes. Numerous other problems existed with respect to the potential marketability of the LFMS software. The rights to use *603 the Radio Shack software on which the LFMS software relied to perform certain accounting functions would have had to be obtained, or a replacement code would have had to be developed before marketing could have proceeded. No documentation, in the form of user or technical manuals, existed for the LFMS software at the relevant dates, although such manuals were necessary for systems offered for sale. The technical support needed to keep a system operational in a customer's office also was essential, especially for systems such as the LFMS software, which combined both hardware and software, but no provision for such support had been made. The hardware on which the LFMS software was designed to run, the Radio Shack TRS-80 Model I microcomputer, was considered hobbyist-grade, not business, equipment due to its low quality, and, during 1983 and 1984, it was becoming outmoded rapidly due to the emerging dominance of IBM-compatible systems (the obsolescence of the hardware is demonstrated by petitioner's replacement of his own Radio Shack computers with IBM-compatible equipment shortly after the donation to Stetson). Petitioner and petitioners' experts dispute the difficulty of doing *604 the work necessary to modify the software to put it into marketable condition, but we find that the need to make such modifications would have had an impact on the value of the donations at the relevant times. Mr. McEwen considered the competitive situation which the LFMS software would face in the market. Such a factor is also probative of market value, for, regardless of a product's ability to function, the product is of little commercial value unless customers can be expected to buy it. Mr. McEwen stated that, even if the LFMS software met all technical requirements for marketability, it would be worthless without a marketing plan, or research of the needs of the market or of competitive products. He concluded that no marketing strategy or research had been done as of the dates of the donations, and that no commitment had been made to incur the expenditures necessary to promote the product in the market. The absence of such research and commitment indicated to him that the LFMS software would not be successful. [12] Mr. McEwen also reviewed the products against which the LFMS software probably would have competed for sales. He concluded that, at the relevant times, sales of *605 computer software performing similar functions in law offices were best where the price of the product did not exceed $ 3,000. Systems priced above that level experienced sales of between one and ten units per year. He therefore did not believe that the LFMS software could be a sales success at the $ 20,000 price suggested by petitioner. The final factor which Mr. McEwen considered was the software market in general. He testified that marketing computer software is a risky and speculative business, and that, even if everything is done properly, a product can fail easily. The vast majority of software products fail before reaching the marketplace, *606 and many that are marketed do not generate enough revenue to cover the costs of developing and selling them. Indeed, petitioner's own experience in attempting to market his "Lawyer Work" software indicates the difficulties of creating demand for computer software products. Also, Mr. McEwen agreed with Mr. Stinnett's observation that, at the relevant times, attorneys were slow to adopt new technology, and concluded that, consequently, any marketers of the LFMS software would have had to overcome the sales resistance of their prospective customers if the venture was to have been a success. Accordingly, given that even properly designed and marketed programs experienced difficulty in the market, it was Mr. McEwen's opinion that the chances were very slight that a system that had as many problems as the LFMS software could be marketed successfully, and that no one would have paid anything for the rights to the LFMS software as it existed on the relevant dates. We agree with respondent's expert and hold that petitioner's donations to Stetson had no value. [13]
*607 Section 6653(a)
Respondent determined that the entire amount of petitioners' underpayments for 1983 and 1984 were attributable to negligence and imposed the additions to tax provided by section 6653(a). Section 6653(a)(1) provides for an addition to tax of 5 percent of the total underpayment for the year where any part of any underpayment in that year is due to negligence or intentional disregard of rules and regulations. Commissioner v. Asphalt Products Co., 482 U.S. 117 (1987). Section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that their underpayments were not attributable to negligence. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Rule 142(a). Negligence is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). See also Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), *608 affg. 43 T.C. 168 (1964). We hold that petitioners are liable for the additions to tax for negligence. Petitioner's approach to valuing the LFMS software was unreasonable. He made no effort to consult an independent appraiser concerning the value of the LFMS software. Instead, petitioners' deductions were supported by nothing more than a two-paragraph letter prepared by petitioner only two days before petitioners' 1983 return was due. That letter was based on a mere cursory and superficial inquiry into the issue of valuation. Furthermore, petitioner was aware that the LFMS software derives its value from its sales and earning potential, and not from the expenditure necessary to reproduce it. In his memorandum to Mr. David Miller, petitioner admitted that the value of the LFMS software depended upon its viability as a salable commercial product, and not upon its development cost. Nevertheless, in preparing the April 13, 1984, letter stating the value of his donations for purposes of claiming the charitable contribution deductions, petitioner disregarded the appropriate standard for determining the value of the gifts and instead used the development cost method. *609 Moreover, petitioner's estimate of development costs was careless. The record does not show that petitioner made any inquiries or did any research concerning the cost of developing a system such as the LFMS software, or that the figure stated in his April 13, 1984, letter represents anything other than an uninformed guess about development costs. His estimate that developing the LFMS software would take three years of work by an attorney and full-time programmer is contradicted by the fact that he and his daughter, a recent high school graduate, worked out the major features of the system over the summer of 1981 and completed the entire project 26 months after it was begun. The system probably would have been completed much sooner if petitioner's daughter had been able to devote her full attention to it, which her status as a full-time student at Duke University prevented. In his estimate, petitioner found that the programming services needed to reproduce the LFMS software would cost $ 225,000, or $ 75,000 per year in each of the three years projected for its development. Furthermore, he claimed that development of the system would require the services of an attorney, at a cost *610 of $ 450,000. Actually, petitioner expended between $ 10,000 and $ 12,000 for his daughter's services in each of the two years, approximately, needed to develop the LFMS software. Under the circumstances, we do not think it reasonable to conclude that an attorney and a full-time professional programmer would require 3 years of effort and $ 650,000 to complete a project which a recent high school graduate and a lawyer with an active practice could finish in 26 months of mostly part-time work at an out-of-pocket cost of little more than $ 20,000. [14]
Under the circumstances of the instant case, we find that petitioner did not act in a reasonably prudent manner. *611 We therefore hold petitioners liable for the negligence addition. Section 6659
Respondent determined in the notice of deficiency that the underpayments in 1983 and 1984 attributable to the charitable contribution deductions were due to valuation overstatements. Section 6659 provides, inter alia, for an addition to tax on underpayments of $ 1,000 or more which are attributable to valuation overstatements. Section 6659(c) defines "valuation overstatement" to include the claim on a return of a valuation of 150 percent or more of the correct valuation. The amount of the addition equals the applicable percentage, as determined under section 6659(b), multiplied by the underpayment of tax resulting from the overvaluation. Sec. 6659(a); H. Rept. No. 97-215 (Conf.), at 262, 1981-2 C.B. 481, 515. We have held above that petitioner's donations to Stetson had no value as of the dates of the donations. Because the values claimed on petitioners' returns in each of the years in issue exceed the correct value determined in each such year by more than 150 percent, and because the underpayments resulting from the valuation overstatement exceed $ 1,000 in each year, we sustain *612 respondent's determination of the addition under section 6659. Section 6621(c)
Respondent determined in his notice of deficiency that petitioners' underpayments attributable to the charitable contribution deductions are subject to interest at the rate determined under section 6621(c). Section 6621(c) provides for an increased rate of interest where there is an underpayment of taxes in excess of $ 1,000 attributable to one or more enumerated "tax-motivated transactions" in any year. Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into before the date of the enactment of section 6621(c). Gantner v. Commissioner, 91 T.C. 713, 731 (1988), affd. 905 F.2d 241 (8th Cir. 1990); Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Tax motivated transactions include, inter alia, valuation overstatements within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). We have held above that the underpayments on petitioners' 1983 and 1984 returns were due to valuation overstatements as defined by *613 section 6659(c) and that the underpayments on petitioners' returns attributable to such valuation overstatements exceeded $ 1,000 in both 1983 and 1984. We therefore hold that the increased rate of interest determined under section 6621(c) applies to the underpayments caused by such valuation overstatements. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Except as otherwise noted, all section references are to the Internal Revenue Code, as amended and in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50% of the interest due on the portion of the underpayment attributable to negligence.↩
2. As used hereinafter, the term "petitioner" will refer to Anthony Provitola.↩
3. Until December 28, 1983, when 40 percent of the shares of stock in LCC was transferred to Stetson University, petitioner was sole shareholder of the corporation. Until May 10, 1984, when Stetson received the remainder of the shares of stock in LCC, petitioner was sole director and officer of the corporation.↩
4. The parties have stipulated that Stetson is an educational organization described in section 170(b)(1)(A)(ii).↩
5. Petitioners claimed a deduction in the amount of $ 105,866.46 for such donation because the provisions of section 170(b) limited the allowable deduction to 30 percent of petitioners' adjusted gross income.↩
6. Because the provisions of section 170(b) limited the charitable deduction allowable for the donation to 30 percent of petitioners' adjusted gross income, petitioners claimed a deduction of $ 60,982.67.↩
7. Respondent, on brief, urges that the value of the 1983 contribution of 40 percent of the shares of stock in LCC be reduced below the pro rata portion of the total value of the shares to take account of the fact that it represented a minority stake in a closely held corporation, and thus did not convey an effective voice in LCC's affairs. We do not address that issue, however, in view of our decision on the value of the contribution.↩
8. Mailman v. Commissioner, T.C. Memo. 1989-88, affd. without published opinion 902 F.2d 1557 (2d Cir. 1990); Stratton v. Commissioner, T.C. Memo. 1969-50, affd. per curiam 422 F.2d 872↩ (2d Cir. 1970).
9. For purposes of this opinion, the terms "reproduction," "replacement," and "development," when used to describe cost, are synonymous.↩
10. Raznatovich v. Commissioner, T.C. Memo. 1980-436; Rainier Companies, Inc. v. Commissioner, T.C. Memo. 1977-351; Stratton v. Commissioner, T.C. Memo. 1969-50, affd. per curiam 422 F.2d 872 (2d Cir. 1970). In his published guidelines, respondent has taken a similar approach to use of reproduction cost in valuing property for purposes of the section 170 deduction. Such guidelines direct that reproduction cost be considered, but only to the extent it is probative of value. Rev. Proc. 66-49, secs. 2.04, 2.07, 1966-2 C.B. 1257↩, 1257-1258.
11. The authors offer several precautions regarding the use of replacement cost as a measure of value. They observe that the replacement cost method assumes that cost is representative of economic value, and that such an assumption is not always valid. G. Smith and R. Parr, Valuation of Intellectual Property and Intangible Assets 223 (1989). They note that cost is not comparable to value, and that if the economic benefits realizable from the property are small, the property's value will be low regardless of the amount of money needed for development. Smith and Parr, supra at 233. They conclude that: Use of the cost approach as a means to estimate a range of value for intellectual property has much potential for error. One or both of the other valuation approaches [i.e. comparable sales or income forecast] should be used if possible as support for the indication of value that is provided by the cost approach. Smith and Parr, supra↩ at 244.
12. Stetson subsequently developed a marketing plan, but the post-donation development of such a plan does not change our conclusion. Such a plan was necessary for successful marketing, and its absence at the time of the donation necessarily would have had an impact on the value of the gift, since the donee would have been required to expend resources to develop one.↩
13. We have considered, and find no basis for any intermediate conclusion in regard to the value of the LFMS software. Neither party has given us the basis for such a conclusion largely because petitioner has relied solely on the development cost approach to valuing the LFMS software, and we have found that such an approach is inappropriate in the instant case. See Parker v. Commissioner, 86 T.C. 547, 562↩ (1986).
14. We note that petitioner devoted a considerable amount of time to the development of the LFMS software, for which he received no direct compensation; however, even if a reasonable estimate of the value of his services is included in the cost of the system, the hypothetical cost of reproducing the system still outstrips the actual cost by a wide margin.↩